**Arthur BARNES and Michelle Barnes, Plaintiffs–Appellants,**

v.

**Laura ANDERSON, Bernardo Aviles, Arnold Thomas, Alan Kaplan, and Randal Meierdierks, Defendants–Appellees.**

**Docket No. 98–9114.**

United States Court of Appeals, Second Circuit.

Argued June 7, 1999.

Decided Aug. 25, 1999.

As Amended Dec. 17, 1999.

152

**152**

Gregory Antollino, New York, NY, for Plaintiffs–Appellants.

Thomas B. Litsky, Assistant Attorney General, New York, N.Y. (Eliot Spitzer, Attorney General of the State of New York, John W. McConnell, Deputy Solicitor General, Robert A. Forte, Assistant Attorney General, New York, NY, on the brief), for Defendants–Appellees.

Before: WINTER, Chief Judge, OAKES, and SACK, Circuit Judges.

SACK, Circuit Judge:

This litigation arose in the wake of an altercation between court security officers and plaintiffs Arthur and Michelle Barnes at New York City Housing Court. The melee resulted in plaintiffs' arrest and, according to plaintiffs, Mrs. Barnes' miscarriage. Plaintiffs, who are African Americans, thereafter filed suit against several of the security officers alleging numerous civil rights violations pursuant to 42 U.S.C. § 1983 and related state-law claims. After a jury verdict in defendants' favor, the United States District Court for the Southern District of New York (Dominick L. DiCarlo, *Senior Judge,* United States Court of International Trade, sitting by designation) entered judgment dismissing plaintiffs' second amended complaint.

Plaintiffs seek a new trial, arguing that the district court erred in four respects: (1) denying plaintiffs' two *Batson* motions challenging defendants' striking of African Americans as potential jurors; (2) instructing the jury not to consider for any purpose the fact that Mrs. Barnes suffered a miscarriage; (3) failing to sustain plaintiffs' objections to certain comments made by defendants' counsel in summation; and (4) failing to act impartially at several points during the trial.

## BACKGROUND

Most of the events critical to this appeal took place in the New York City Housing Court on December 15, 1995. That morning, plaintiffs were in court to contest an eviction proceeding brought by the New York City Housing Authority. The courtroom was on the raucous side, filled to overflowing with lawyers, landlords, and unhappy tenants. Eventually, plaintiffs' case was called, at which point Mr. and Mrs. Barnes requested counsel. At the same time, Douglas Seidman of the Legal Aid Society indicated that he was there to represent the Barneses. A great deal of

confusion followed, with Mrs. Barnes becoming increasingly upset as a result. Mrs. Barnes and Mr. Seidman then conferred outside the courtroom. When the case again was called, both approached the bench. It is not at all clear what happened next, except that Mrs. Barnes became still more distraught, eventually walking out of the courtroom in tears.

Mr. Barnes testified that, as he got up to follow his wife out of the courtroom, defendant Laura Anderson, a court security officer, said "Now there's enough room for people to sit down, you fat nigger." Mr. Barnes, a portly man, admits that as he continued out of the courtroom after Anderson's alleged comment, he said "Fuck you" to defendant Bernardo Aviles, another court security officer, and then repeated that comment to the entire courtroom. Officer Aviles followed plaintiffs out of the courtroom, stopping Mr. Barnes and telling him in no uncertain terms that his behavior had been inappropriate. Plaintiffs claim that Officer Aviles punctuated these comments by poking Mr. Barnes in the chest, and that Mr. Barnes warned him to stop. Officer Aviles then told Mr. Barnes that he was going to issue a summons to him, and Barnes claims that at that point Aviles physically pushed him against a wall.

Other uniformed security officers began to arrive on the scene. According to Mrs. Barnes, they attacked her husband in an effort to bring him to the floor. In the meantime, Mrs. Barnes said, Officer Anderson took hold of and twisted one of her arms and placed a knee against her back and her legs. Mrs. Barnes also stated that someone hit her in her back and that her back was "burning." Mrs. Barnes claims that she was pregnant at the time and that she told the officers as much.

Mrs. Barnes testified that defendant Arnold Thomas, another court security officer, then ordered the officers to arrest her. Mrs. Barnes says that when she asked why she was being arrested Officer Thomas responded, "We will find something." Mrs. Barnes was handcuffed and, along with Mr. Barnes, taken to central booking.

Plaintiffs each were charged with criminal contempt in the second degree, obstruction of governmental administration, and attempted assault in the third degree. Mr. Barnes was also charged with resisting arrest. Eventually, all of these charges were dropped on the ground that prosecution was barred by the speedy trial provisions of New York state law.

Two months after the Housing Court incident, on February 16, 1996, under circumstances not disclosed in the record, Mrs. Barnes was attacked on the street by two women. While one of the women choked her from behind, pulling her to the ground, the second kicked Mrs. Barnes in her back, legs, and arms. After the attack, Mrs. Barnes vomited twice, experienced abdominal cramps, and was taken by ambulance to a hospital.

A sonogram performed two weeks later, on February 29, 1996, revealed that Mrs. Barnes' fetus was dead. On March 5, 1996, the fetus was surgically removed.

Approximately one year later, plaintiffs filed this civil rights lawsuit against three of the security officers involved in the courthouse incident: Officers Anderson, Aviles, and Thomas. Plaintiffs also brought claims against Officer Randy Meierdierks and Supervising Officer Major Allen Kaplan, but the district court dismissed these claims before they reached the jury. Plaintiffs do not appeal this dismissal.

Plaintiffs' second amended complaint alleged, *inter alia*, that defendants violated 42 U.S.C. § 1983 by: (1) unlawfully seizing plaintiffs; (2) using excessive force; (3) maliciously prosecuting plaintiffs; and (4) denying immediate medical attention to Mrs. Barnes.[1] It alleged also that plain-

1. Plaintiffs also asserted a host of other claims, including state constitutional and common law causes of action overlapping the § 1983 claims discussed in the text; a § 1983

tiffs experienced various injuries as a consequence of these violations, including the miscarriage endured by Mrs. Barnes. Plaintiffs requested $3.5 million in compensatory damages, as well as punitive damages, costs and fees, and an injunction requiring officers at the Housing Court to be properly supervised, trained, and disciplined.

The case proceeded to trial. During jury selection, defendants struck three African–American jurors from the panel with peremptory strikes, triggering two separate motions by plaintiffs pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (racial discrimination in the use of peremptory strikes unconstitutional). Both motions were denied, and a jury with one African–American member was empaneled.

During the trial, both sides presented by affidavit the reports of their respective medical experts concerning Mrs. Barnes' miscarriage. Defendants' expert, Dr. Bernard Sicuranza, opined that Mrs. Barnes had not become pregnant until January 10, 1996; that trauma can cause a miscarriage; that a trauma-induced miscarriage would be accompanied by a significant, "heavy" amount of hemorrhage; and that such hemorrhage would not appear immediately but instead would occur a week to ten days after the miscarriage. Noting that only a small amount of fresh hemorrhage was discovered when Mrs. Barnes' fetus was removed on March 5, 1996, Dr. Sicuranza concluded that the December 15, 1995 incident at the Housing Court "can be ruled out as the cause of Ms. Barnes' miscarriage."

Responding to Dr. Sicuranza's report, plaintiffs' expert, Dr. David Barad, opined in his report that Mrs. Barnes became pregnant sometime prior to December 21, 1995, possibly as early as October 26, 1995;

that the pregnancy terminated at some point between December 21, 1995 and the first week of January; that trauma may cause a miscarriage; that miscarriage-inducing trauma usually involves hemorrhage, but the hemorrhage may not occur until the actual expulsion of the fetus; and that it is not unusual for the body to retain a dead fetus for weeks.

. At the close of the evidence, the district judge indicated his concern that plaintiffs had failed to come forward with sufficient expert medical evidence concerning Mrs. Barnes' miscarriage to permit a reasonable jury to find that the events in the courthouse caused the miscarriage. Although recognizing that both experts had stated that trauma, generally, can cause a miscarriage, the court observed that there was no testimony to the effect that Mrs. Barnes' experience at the court resulted in a trauma of this sort. Accordingly, the court instructed the jury not to consider the fact of the miscarriage for any purpose, an instruction that in substance amounted to a judgment as a matter of law in defendants' favor pursuant to Fed.R.Civ.P. 50(a).

Ultimately, the jury found for defendants on all remaining counts.

## DISCUSSION

Plaintiffs contend that they are entitled to a new trial as a result of four errors. First, plaintiffs assert that the district court erred in denying their two *Batson* motions challenging on grounds of racial discrimination defendants' use of peremptory strikes. Second, plaintiffs argue that the court erred when it instructed the jury not to consider the fact of Mrs. Barnes' miscarriage for any purpose on the ground that plaintiffs had failed to come forward with sufficient expert medical evidence of causation. Third, plaintiffs assert that the

---

claim against Major Kaplan for failure to supervise; a § 1983 claim against Officer Meierdierks for retaliation against plaintiffs for their exercise of constitutional rights; and a 42 U.S.C. § 1985(c) claim asserting that

Officers Anderson, Aviles, and Thomas conspired to deprive plaintiffs of their civil rights because of their race and because Mr. Barnes is obese.

district court erroneously failed to sustain their objections to various comments made by defendants' counsel during summation. Finally, plaintiffs argue that the district court acted throughout the trial in a manner inconsistent with its obligation to retain an appearance of impartiality.

## I. Whether the district court erred in denying either of plaintiffs' *Batson* motions.

A. *Framework for analyzing a* Batson *motion*

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court reaffirmed the long-standing principle that the Equal Protection Clause is violated when prosecutors "challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Id.* at 89, 106 S.Ct. 1712; *see also Swain v. Alabama,* 380 U.S. 202, 203–04, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Strauder v. West Virginia,* 100 U.S. 303, 308–10, 25 L.Ed. 664 (1880). More significantly, however, *Batson* abandoned *Swain*'s apparent holding, 380 U.S. at 224–28, 85 S.Ct. 824, that a defendant could meet the burden of proving racial discrimination on the part of the State only by showing that prosecutors had an established practice of using peremptory strikes to exclude persons from juries on the basis of their race. *See Batson,* 476 U.S. at 95–96, 106 S.Ct. 1712. *Batson* held instead that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Id.* at 96, 106 S.Ct. 1712.

*Batson,* extended to civil cases by *Edmonson v. Leesville Concrete Co., Inc.,* 500 U.S. 614, 630, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), directs courts to apply a three-step, burden-shifting analysis to determine whether a peremptory strike has been exercised in a racially discriminatory manner:

> When a *Batson* challenge is raised, the trial court must decide
>
> (1) whether the [movant] has made a prima facie showing that the [non-movant] has exercised its peremptory strike on the basis of race,
>
> (2) if so, whether the [non-movant] has satisfied its burden of coming forward with a race-neutral explanation for striking the juror in question, and
>
> (3) if so, whether the [movant] has carried his burden of persuasion of proving purposeful discrimination.

*United States v. Diaz,* 176 F.3d 52, 76 (2d Cir.1999) (citing *Batson,* 476 U.S. at 96–98, 106 S.Ct. 1712; and *Purkett v. Elem.,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam)), *cert. denied,* —— U.S. ——, 120 S.Ct. 314, 145 L.Ed.2d 153 (1999).

The first step in this analysis, a prima facie showing of discrimination, merely requires the movant to

> show that the circumstances raise an inference of racial discrimination. Such an inference may stem from a pattern of strikes against minority jurors included in the particular venire or even from the manner of the [non-movant's] questions and statements during voir dire examination. However, because of the elusive nature of the inquiry, a trial judge is not limited to just these two sources for discriminatory inferences. Rather, a trial judge has "broad latitude to consider the totality of the circumstances when determining whether a defendant has raised an inference of discrimination."

*Id.* (quoting *United States v. Stavroulakis,* 952 F.2d 686, 696 (2d Cir.), *cert. denied,* 504 U.S. 926, 112 S.Ct. 1982, 118 L.Ed.2d 580 (1992)) (internal citations omitted).

If the court determines that the movant has made a prima facie showing, the burden shifts to the non-movant to offer a non-discriminatory rationale for the

strike. This does not require a probing inquiry by the district court:

> The second step of this process does not demand an explanation that is persuasive, or even plausible.... [T]he issue is the facial validity of the [non-movant]'s explanation. Unless a discriminatory intent is inherent in the [non-movant]'s explanation, the reason offered will be deemed race neutral.

*Purkett*, 514 U.S. at 767–68, 115 S.Ct. 1769 (quotation marks omitted).

■ Only at the third step of the analysis does the persuasiveness of the non-movant's race-neutral explanation become relevant. *See id.* at 768, 115 S.Ct. 1769. At that point, the movant must satisfy his or her burden of persuasion and prove intentional race discrimination. *See Batson*, 476 U.S. at 98, 106 S.Ct. 1712. The third-stage analysis thus compels courts to determine "the credibility of the proffered explanations." *United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991).

■ Where a court fails to make such a finding with respect to the proffered explanation for each challenged strike, "the appropriate course [usually will be] to remand for findings by the [court] as to [the challenged strikes] and an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." *Id.* A remand for further findings may not be practical in all circumstances, however. We have recognized that the trial court

> might encounter some difficulty recalling the circumstances of the jury selection and might conclude that examination of the record, supplemented by such further hearing on remand as [the court] deems appropriate, may not yield a satisfactory basis for determining the [non-movant]'s state of mind when the jury was selected. If [the court] concludes

that the passage of time has unduly impaired [its] ability to make a fair determination of the [non-movant]'s intent, [the court] may so state, in which event the ... [c]ourt shall order a new trial.

*Id.*

### B. *Review*

Although the record is somewhat unclear, it appears that the district court in this instance committed the precise error discussed in *Alvarado:* denial of a *Batson* motion without explicit adjudication of the credibility of the non-movant's race-neutral explanations for the challenged strikes.

Plaintiffs made their initial *Batson* motion after defendants exercised their first two peremptory strikes to exclude African–American jurors. In response, defendants explained that they struck the first juror because she was suing her landlord in Housing Court and the second "based on her knowledge as a medical assistant." After some confusion and the counter-assertion of a *Batson* motion by defendants, the court denied plaintiffs' motion, saying: "You [defendants' counsel] stated in summary a sufficient reason. I don't find it pretextual." [2]

■ If this was the extent of the *Batson* issue, then the only question before us would be whether the district court erred in finding defendants' explanation credible, a finding entitled to "great deference." *See Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712. But, after the district court rejected plaintiffs' first *Batson* motion, defendants exercised their third peremptory strike to exclude another African–American juror, and plaintiffs made a second *Batson* motion. Defendants again responded with a race-neutral explanation: the stricken juror had

**2.** It is clear that the court was referring to plaintiffs' *Batson* motion and to defendants' counsel as "you" because: (1) at that point, only defendants had offered explanations for the exercise of strikes; and (2) immediately

following this exchange, the court directed plaintiffs to offer their own race-neutral explanations in response to defendants' counter-motion.

testified that her son was involved with an encounter, incident with police officers on more than one occasion. She did say she could be fair, but it is our feeling that as a mother's instinct, she would have to have some animus or something.

A great deal of confusion followed, with the court stating at one point "I find that the reason given is sufficient to take it out of the realm of race." It is not clear, however, whether the district court thus found that defendants' explanation was credible and, therefore, that plaintiffs had failed to carry their ultimate burden of proof or, instead, that defendants' explanation merely sufficed to satisfy their second-step burden of articulating a non-racial explanation. The matter grew murkier still when the district court followed this comment by again raising the question of whether plaintiffs' own strikes violated *Batson.* Then the court purported to resolve the question of whether either party had violated the *Batson* principle:

> I won't rule on credibility of attorneys right now myself, but I find both cases have sufficient reason. I am not stating whether or not I buy all of your arguments even on this one [referring to one of plaintiffs' counsel's explanations]. . . . I think you have stated a reason to take it out, both of you have.

We cannot square the district court's explicit refusal to rule on the credibility of either attorney's explanation with the court's duty under the third step of *Batson.* The credibility of an attorney offering a race-neutral explanation is at the very heart of that analysis. Accordingly, we conclude that the district court erred in its application of *Batson* to plaintiffs' second motion.

 Ordinarily in this circumstance we would remand to the district court with instructions either to re-conduct the *Batson* analysis or, if the district court determined that it was no longer possible to do

so effectively, to order a new trial. *See Alvarado,* 923 F.2d at 256. Since, sadly, the trial judge, the Honorable Dominick DiCarlo, has since passed away, were we to remand this case for a hearing on the *Batson* issues, it would be conducted by a district judge who was not present at the trial. While we recognize that a judge other than the trial judge is competent to hold such a hearing, *see Bryant v. Speckard,* 131 F.3d 1076, 1078 (2d Cir.1997) (per curiam), *cert. denied,* 524 U.S. 907, 118 S.Ct. 2066, 141 L.Ed.2d 143 (1998), we are not confident here, in light of the particular circumstances surrounding jury selection, the state of the record, and the unavailability of the trial judge, that such "further proceedings would . . . shed reliable light upon the voir dire." *Wilson v. Hoke,* 945 F.2d 1250, 1252 (2d Cir.1991). We therefore think it the better course to remand the case to the district court for a new trial.

## II. Whether the district court erred in granting judgment as a matter of law dismissing plaintiffs' claim that defendants caused Mrs. Barnes' miscarriage.

The district court gave the jury the following instruction, which plaintiffs challenge: "You are also not to consider the fact that Ms. Barnes miscarried in 1996. Do not consider that in any way in your deliberations in determining liability in awarding damages or for any purpose whatsoever." In substance, this instruction amounted to a judgment as a matter of law, pursuant to Fed.R.Civ.P. 50(a), dismissing plaintiffs' attempt to recover for Mrs. Barnes' miscarriage. As noted, this ruling resulted from the district court's conclusion at the close of the evidence that plaintiffs had failed to come forward with sufficient evidence of causation linking Mrs. Barnes' miscarriage to defendants' conduct. The district court's observations in support of this conclusion are set forth

in the margin.[3]

Plaintiffs responded to this assessment by pointing out that their expert had in fact testified generally that trauma can be the cause of a miscarriage. The district court replied that it would "take judicial notice that trauma can be harmful to pregnancy." But because no expert had testified that defendants' conduct inflicted upon Mrs. Barnes sufficient trauma to cause her to miscarry, the court nonetheless concluded that "evidently there was no doctor called who would be able to testify as to causation." Accordingly, the district court stated that it intended "to instruct the jury that they are not to consider the miscarriage in this case in any way, shape or form on the issue of damages or in any other regard."

The question before us is whether the district court erred in its legal conclusion that in order to recover damages for a miscarriage in this context, a plaintiff must present a medical expert's opinion that the miscarriage was caused by the events of which he or she complains. Plaintiffs argue that this standard is erroneously strict and that causation in this context need not

be proved by expert testimony. In light of the particular circumstances of this case, we disagree.

"Civil actions brought under § 1983 are analogous to state common law tort actions, serving primarily the tort objective of compensation. A § 1983 action, like its state tort analogs, employs the principle of proximate causation." *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir.1999) (citations omitted); *see also Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir.1998) ("as in all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Although proximate causation in the § 1983 context is a question of federal law, in determining the meaning of the concept we look to those state tort analogs, because the " 'Supreme Court has made it crystal clear that principles of causation borrowed from tort law are relevant to civil rights actions brought under section 1983.' " *Warner v. Orange County Dep't of Probation*, 115 F.3d 1068, 1071 (2d Cir.1997) (quoting *Buenrostro v. Collazo*, 973 F.2d 39, 45 (1st Cir.1992)); *see also*

**3.** I have no record here that says [the miscarriage] was caused by the incident, absolutely none.... My recollection of the testimony in this particular case is ... plaintiff has miscarried before. She had twin children and there was a miscarriage. She had two subsequent children.... The incident in the case has occurred. And there is a dispute between the parties as to whether or not she was pregnant in October or pregnant in November. We have statements from two doctors. One is [plaintiffs'] doctor who said he disagrees with the defendant's [*sic*] doctor that the pregnancy occurred in October because of some measurements he had taken. Nowhere in his statement does he state that it was the incident referred to in this trial that caused the miscarriage.

Contrary to that, we do have statements in the record from the other doctor that it was not a competent producing cause of the miscarriage, because if the incident had occurred, there would have been severe bleeding after a certain period in time.

In addition to that, we have a statement, I believe, by the plaintiff in this case that no one ever told her that the incident in December was the proximate cause of the

miscarriage. To me that's the totality of the record.

\* \* \* \* \* \*

Based on this record ..., with no hospital record ... which indicates causation at all; no testimony from any doctor that says the miscarriage was caused by the incident; I think miscarriage is not a kind of thing that a lay jury can come to a conclusion on without the assistance of some medical testimony.

And I don't think there is any medical testimony that states that this is the proximate cause. Forgetting about whether or not to any degree of medical certainty, there is absolutely nothing in here on that issue.

\* \* \* \* \* \*

Even if we have full agreement between the two doctors as to when the pregnancy occurred, I would still take the position that there is absolutely no evidence for the jury to make that determination based on the paucity of evidence here. We don't even have any doctor, her doctor telling the plaintiff that this was the cause of it.

*Malley v. Briggs*, 475 U.S. 335, 344 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 833 n. 9, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (Brennan, *J.*, concurring); *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled on other grounds, Monell v. Department of Soc. Serv. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).[4]

In this instance, the district court concluded that proof of proximate cause of a miscarriage required expert medical evidence specifically attributing that injury to the acts of which the plaintiff complained.[5] We find this to be entirely consistent with analogous tort law doctrine. In particular, it is consistent with the principle that

> [e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person.

*Shegog v. Zabrecky*, 36 Conn.App. 737, 654 A.2d 771, 776 (1995); *see also Fane v. Zimmer*, 927 F.2d 124, 131 (2d Cir.1991) (construing New York law to require expert medical testimony attributing bone fracture to breakdown of hip implant in order to establish proximate causation on a negligent failure to warn claim); *Gold v. Dalkon Shield Claimants Trust*, No. B–82–383 (EBB), 1998 WL 351456, at *3 (D.Conn. June 15, 1998) ("Expert testimony is required when the factual content of the underlying issues is not found within the laypersons' common knowledge and experience.... Medical evidence relating to causes of injury to the human body is not normally considered to dwell within the common knowledge of a layperson."), *aff'd w'out opinion*, No. 98–9346, 1999 WL 627689 (2d Cir.1999); *cf. South Burlington Sch. Dist. v. Calcagni Frazier Zajchowski Architects, Inc.*, 138 Vt. 33, 410 A.2d 1359, 1365 (1980) (stating, in a case involving property damage rather then physical injury, that "when a physical process is obscure, abstruse or so far outside common experience that lay jurors can only speculate about it expert testimony is required to explain the process.").

The requirement that plaintiffs produce expert medical evidence in order to prove proximate causation of medical injury also is often expressed in the context of medical malpractice claims.[6] *See Milano v. Freed*, 64 F.3d 91, 95 (2d Cir.1995); *Hegger v. Green*, 646 F.2d 22, 28–29 (2d Cir.1981); *Monahan v. Weichert*, 82 A.D.2d 102, 107, 442 N.Y.S.2d 295 (4th Dep't 1981). As

---

**4.** *Taylor v. Brentwood Union Free School District*, 143 F.3d 679, 686 (2d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1027, 143 L.Ed.2d 37 (1999), is not to the contrary. *Taylor* quotes the dissent in *City of Springfield v. Kibbe*, 480 U.S. 257, 269, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (writ of certiorari dismissed as improvidently granted) (O'Connor, *J.*, dissenting), for the proposition that "[t]he causation requirement of § 1983 is a matter of statutory interpretation rather than of common tort law." 143 F.3d at 686. Justice O'Connor's dissent, however, nonetheless went on to analogize to "traditional tort principles" in order to describe the parameters of causation in the § 1983 context. *See* 480 U.S. at 269, 107 S.Ct. 1114.

In any event, a conclusion that interpretation of the concept "proximate cause" should proceed from principles of statutory interpretation rather than from borrowed common law concepts would not lead to a different outcome in the instant case; if anything, the *Kibbe* dissent suggests that the requirements to establish causation are stricter in the § 1983 context than at common law. *Cf. id.* (describing *Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), as standing for the proposition that an "injury [in that case was] 'too remote a consequence' of official conduct to impose liability under § 1983, even if conduct 'proximately caused' injury under state tort law.").

**5.** The district court specifically refrained from considering what degree of medical certainty might be required in this context. That issue is not before us, and we express no opinion on it.

**6.** Medical malpractice cases also require that expert testimony be employed to establish that the defendant breached a duty of due care to the plaintiff, an issue obviously not presented by the case at bar.

previously indicated, however, the principle is by no means limited to the medical malpractice context. *See Duffen v. State*, 245 A.D.2d 653, 653, 665 N.Y.S.2d 978 (3rd Dep't 1997) ("Whether the claim is considered to assert a cause of action sounding in negligence or one for malpractice, there cannot be serious doubt that the issue of [w]hether and to what extent ... medications contributed to claimant's condition is not a matter of common knowledge which a fact finder could decide in the absence of expert testimony.") (internal quotation marks and citation omitted) (alteration in original).

Applying this principle in the context of plaintiffs' claim that defendants' conduct caused Mrs. Barnes' miscarriage, we conclude as did the district court that, particularly in the circumstances of the present case, a miscarriage is the sort of complex injury for which expert medical evidence of causation is required. In view of the uncertain timing of the beginning and ending of Mrs. Barnes' pregnancy, the unclear nature of the physical contact she allegedly suffered at the Housing Court, and the fact that Mrs. Barnes was physically assaulted by others subsequent to the incident at the Housing Court but possibly prior to the miscarriage, we do not see how a jury could rationally decide causation in this instance without the aid of expert testimony. *Cf. Collette v. Collette*, 177 Conn. 465, 418 A.2d 891, 894 (1979) (holding that it was error for a court to permit a layperson to testify as to the cause of a miscarriage because "evidence of the cause of the miscarriage, or more broadly, of the medical effect upon the human system of the infliction of injuries, is generally not within the sphere of the common knowledge of a lay witness.").

The decisions cited by plaintiffs for the contrary proposition, *Comeau v. Beck*, 319 Mass. 17, 64 N.E.2d 436 (1946), and *Atwood v. Washington Water Power Co.*, 79 Wash. 427, 140 P. 343 (1914), are not inconsistent with this conclusion. In *Comeau*, the plaintiff had filed a personal injury suit to recover for a miscarriage she suffered after having been involved in an automobile accident in which her abdomen struck the automobile's steering wheel. *See* 64 N.E.2d at 436. The plaintiff produced no medical evidence on the question of causation, relying instead on her own testimony that she was pregnant at the time of the accident, suffered abdominal pain and was bedridden for a week after the accident, and suffered the miscarriage nine days after the accident. *See id.* The defendant argued, among other things, that the jury could not find that the miscarriage was caused by the accident in the absence of medical testimony to that effect. *See id.* at 437. In the end, the court neither accepted nor rejected this principle, recognizing that defendant's own medical expert had testified that the abdominal blow suffered by the plaintiff could have caused a miscarriage. *See id.* The court concluded that this testimony in conjunction with the plaintiff's account of her experience sufficed to establish causation. *See id.*

Similarly, in the 1914 *Atwood* decision, the plaintiff sought to recover for a miscarriage allegedly caused by a rough ride on the defendant's street car. *See* 140 P. at 344. In response to the defendant's argument that there was insufficient evidence of causation, the court stated that the evidence was sufficient in that it showed "a sequence of events, physical symptoms beginning at once, growing rapidly in intensity, and culminating in a short time in a miscarriage." *Id.* at 345. The plaintiff had not merely relied on her own testimony, however, but also had called a physician who opined that the plaintiff's experience on the street car had caused the miscarriage. *See id.* Accordingly, we take neither *Atwood* nor *Comeau* to stand for the proposition that medical evidence of causation is as a rule unnecessary where causation of a miscarriage is in issue. We therefore affirm the district court's conclusion that plaintiffs were obliged to come forward with medical expert evidence of

causation in order to recover for Mrs. Barnes' miscarriage under § 1983,[7] an obligation which was not satisfied here.

The Rule 50(a) dismissal of plaintiffs' claims based on Mrs. Barnes' miscarriage is therefore affirmed. Although plaintiffs are entitled to a new trial on *Batson* grounds, having lost as a matter of law on their miscarriage-based claims, they are not entitled to relitigate those claims in the course of the new trial. *See, e.g., Rafaeli v. Degonia,* 156 F.3d 891, 892 (8th Cir. 1998) (Judgment as matter of law pursuant to Rule 50(a) judgment not nullified by grant of new trial on *Batson*-like gender-based juror-challenge grounds); *Montiel v. City of Los Angeles,* 2 F.3d 335, 343 (9th Cir.1993) (granting new trial because of *Batson* violation but also affirming trial court's Rule 50(a) dismissal of claim against one defendant).

Our decision to grant a new trial on *Batson* grounds obviates the need for us to consider plaintiffs' remaining arguments that the district court erred by failing to sustain certain objections to defendants' closing statement and by allegedly failing to maintain an appearance of impartiality during the trial.

### *CONCLUSION*

The district court's denial of plaintiffs' second *Batson* motion is reversed and a new trial is ordered. The district court's judgment as a matter of law dismissing plaintiffs' claims insofar as they seek to recover for Mrs. Barnes' miscarriage is affirmed.

Defendants shall pay plaintiffs' costs on appeal.

---

**7.** To the extent that plaintiffs seek to recover for the miscarriage also under New York state law, the same standard applies. *See, e.g., Milano,* 64 F.3d at 95 (applying New York law); *Fane,* 927 F.2d at 131 (applying New York law); *Duffen,* 245 A.D.2d at 653, 665 N.Y.S.2d 978.