**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**June 11, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

ALONZO CORTEZ JOHNSON,

    Petitioner - Appellee,

v.

WILLIAM "CHRIS" RANKINS,

    Respondent - Appellant.

No. 23-5095
(D.C. No. 4:16-CV-00433-TCK-CDL)
(N.D. Okla.)

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:16-CV-00433-TCK-CDL)**
_____

Tessa L. Henry, Assistant Attorney General (Gentner F. Drummond, Attorney General, with her on the brief), Oklahoma Office of the Attorney General, Oklahoma City, OK, for the Respondent - Appellant.

James L. Hankins, Law Office of James L. Hankins, Edmond, OK, for the Petitioner - Appellee.
_____

Before **PHILLIPS**, **MORITZ**, and **EID**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

In 2021, a panel of this court reviewed state prisoner Alonzo Cortez Johnson's petition for federal habeas relief under 28 U.S.C. § 2254. *Johnson v. Martin*, 3 F.4th 1210, 1216 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1350

(2022). Johnson (a Black man) asserted that he was being held in violation of his constitutional rights because the state court had failed to follow the appropriate procedural steps under *Batson v. Kentucky*, 476 U.S. 79 (1986). We reviewed Johnson's *Batson* claim de novo and agreed that the state court had bungled *Batson*'s procedural framework after Johnson alleged that the prosecutor had exercised peremptory strikes based on race. *Johnson*, 3 F.4th at 1225–27. To remedy this error, we remanded the case with instruction for the district court to hold a *Batson* reconstruction hearing if doing so would not be impossible or unsatisfactory. *Id.* at 1227. Otherwise, we ordered the court to grant Johnson conditional habeas relief, unless the state granted him a new trial within 120 days. *Id.*

On remand, the district court granted Johnson conditional habeas relief because it decided that holding a *Batson* reconstruction hearing would be "both impossible and unsatisfactory." *Johnson v. Rankins*, — F. Supp. 3d. —, 2023 WL 5055491, at *6 (N.D. Okla. Aug. 8, 2023). That is the decision on review: Did the district court abuse its discretion in assessing that a *Batson* reconstruction hearing would be "impossible or unsatisfactory" in this case? We conclude that, yes, this was an abuse of discretion, and so we reverse and remand to the district court to hold a *Batson* reconstruction hearing.

**BACKGROUND**

Johnson was convicted of first-degree murder and conspiracy to commit first-degree murder in Oklahoma state court. Those facts are laid out in this

2

court's prior opinion. *See Johnson*, 3 F.4th at 1217. After his conviction,

Johnson exhausted his state remedies for postconviction relief to no avail. He

next sought federal habeas relief from the district court under § 2254. The

district court denied Johnson's § 2254 petition and his request for a certificate

of appealability (COA). Johnson then sought a COA from this court, which we

granted in part. 28 U.S.C. § 2253(c)(1)(A). The partially granted COA allowed

Johnson to appeal the district court's denial of his *Batson* claim.[1]

We reviewed Johnson's *Batson* claim under the confines of the

Antiterrorism and Effective Death Penalty Act (AEDPA). AEDPA erects a

procedural hurdle that a state prisoner must clear before a federal court may

resolve his claim on the merits. 28 U.S.C. § 2254(d). Johnson had to show

either that the state court's decision "was contrary to, or involved an

unreasonable application of, clearly established Federal law" or that the state

court had made "an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." *Id.* Johnson showed that the

Oklahoma Court of Criminal Appeals (OCCA) had failed in both respects.[2]

---

[1] The COA was also granted for Johnson's claims alleging the unfair introduction of gruesome evidence at trial, juror misconduct, and cumulative error. Those issues were resolved in this court's previous opinion. *Johnson v. Martin*, 3 F.4th 1210, 1228–36 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1350 (2022).

[2] First, the OCCA relied on an unreasonable factual determination by "purport[ing] to approve the trial court's acceptance of the prosecutor's multiple race-neutral reasons for his strikes," when in fact "the trial court

(*footnote continued*)

3

*Johnson*, 3 F.4th at 1224–25. Because the OCCA proceedings resulted in "an unreasonable application of *Batson*" and an "unreasonable factual determination to reject Johnson's *Batson* challenge," we proceeded to review de novo Johnson's *Batson* claim. *Id.*

*Batson* establishes a tripartite burden-shifting framework for courts to detect racial discrimination in the exercise of peremptory challenges. 476 U.S. at 96–98. First, the defendant bears the burden to make a prima facie case that prospective jurors have been excluded based on their race. *Flowers v. Mississippi*, 588 U.S. 284, 298 (2019); *see Johnson v. California*, 545 U.S. 162, 168 (2005) (stating that a prima facie case is established "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose" (citation omitted)). Second, if that showing is made, the burden shifts to the prosecution to provide a race-neutral reason for the objected-to strike(s). *Flowers*, 588 U.S. at 298. Third, the court "determine[s] whether the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Id.*

Johnson's habeas petition alleged that the trial court had erred at *Batson*'s second step: the trial judge never prompted the state to give race-neutral justifications for six peremptory strikes that Johnson challenged. During

---

accepted only one such reason . . . and merely speculated as to the other[s]." *Johnson*, 3 F.4th at 1224. Second, "the OCCA's reliance on the trial court's sua sponte speculation about the prosecutor's reasons was an unreasonable application of *Batson*." *Id.* at 1225.

voir dire, Johnson asserted a *Batson* challenge after the state's sixth peremptory strike. Of the state's previous five strikes—excluding prospective jurors Tawil, Dickens, de Wassom, Wilson, and Carranza—Johnson perceived that four were minorities. Johnson calculated that those strikes, plus the sixth strike against prospective juror Martinez (another perceived minority), created "a pattern . . . of striking all minorities off th[e] jury." App. vol. I, at 229. At that point, the trial judge jumped in. *Id.* Preemptively reading the *Batson* tea leaves, the trial judge stated that he saw no discriminatory pattern in the state's strikes because Martinez was "hardly involved in the process" and Carranza and de Wassom both spoke English as their second language.[3] *Id.* at 229–30.

Petitioning this court for habeas relief, Johnson alleged that the trial court's erroneous application of *Batson* violated his Fourteenth Amendment rights under the Equal Protection Clause. *Johnson*, 3 F.4th at 1216, 1219; *see Powers v. Ohio*, 499 U.S. 400, 404 (1991) ("Although a defendant has no right to a petit jury composed in whole or in part of persons of the defendant's own race, he . . . does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." (cleaned up)). Johnson contended that

---

[3] The trial judge asked the state to give a race-neutral reason for only one of its strikes: the second one against juror Dickens—one of the few Black prospective jurors in the venire pool. App. vol. I, at 228. The state obliged, explaining that Dickens's Ph.D. raised "concern[s]" about his potential to be "too exacting." *Id.* But the state never volunteered any race-neutral reasons for the other five stricken jurors, after the trial judge had interjected with his own. *See id.* at 229–30. Johnson never objected to the trial judge's interjection or his not asking the state for race-neutral explanations.

the state's lopsided exercise of peremptory strikes toward venirepersons of color satisfied his burden at *Batson* step one, yet the trial court never proceeded to step two. *Johnson*, 3 F.4th at 1219–20, 1222–23. We agreed that Johnson's initial showing was "more than sufficient to require [the] trial court to proceed to step two of the *Batson* procedure." *Id.* at 1226–27. Because it never did, we established that the trial court had misapplied *Batson*. *Id.* at 1227.

But that error wasn't enough to entitle Johnson to habeas relief. *Id.* Due to the trial court's lapse at *Batson* step two, "the State ha[d] never presented evidence of the prosecutor's actual, nondiscriminatory reasons for striking the five minority jurors." *Id.* Thus, no court had ever evaluated those reasons to determine if the strikes were racially motivated and therefore if Johnson's constitutional rights had been violated. *See id.*; *see also Hernandez v. New York*, 500 U.S. 352, 360 (1991) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). So we decided that the appropriate remedy was to reverse the district court's denial of Johnson's habeas petition and to remand for the district court to hold a *Batson* reconstruction hearing, giving the state a chance to satisfy its obligations at *Batson* step two. *Id.* Given "the passage of over eight years since Johnson's trial," we remanded on an "impossible or unsatisfactory" standard. *Id.* That is, we directed the district court to hold the *Batson* reconstruction hearing only if the court determined that doing so would not be "impossible or unsatisfactory." *Id.* If the court decided otherwise, we instructed, then the court

6

should instead grant Johnson habeas relief conditional on the state's not granting him a new trial within 120 days. *Id.*

On remand, the district court surmised that it would be premature "to decide whether a hearing will be impossible or unsatisfactory" because the court "lack[ed] the circumstantial information necessary to contextualize the prosecutor's stated reasons for the challenged strikes." App. vol. VII, at 2047. For example, the court balked at the record's missing information about the racial makeup of the venire pool, "much less, the race of five of the six jurors the prosecutors attempted to strike." *Id.* To fill in these gaps, the court ordered the parties to conduct discovery that would facilitate the court's "reconstruct[ing] the relevant circumstances bearing on the prosecutor's use of peremptory strikes at the time they were made." *Id.* at 2050.

The parties completed discovery and filed supplemental briefs with the district court. Discovery comprised the state's contemporaneous, handwritten notes from voir dire; the prospective jurors' driver's licenses; an affidavit from the Oklahoma Attorney General's Office with information about each juror's self-identified race, ethnicity, and English-language proficiency; secondary-source research on the meaning of "race"; and depositions conducted with now-retired Judge Tom Gillert (then state trial judge), now-Judge Doug Drummond (then assistant prosecutor), Mark Lyons (defense attorney), and Tim Harris (lead prosecutor).

Despite this evidence, the district court concluded that "it would be impossible and unsatisfactory to hold a meaningful *Batson* reconstruction hearing." *Johnson*, 2023 WL 5055491, at *1. The court acknowledged that, "[a]rguably," proceeding to *Batson*'s second step would not be "impossible or unsatisfactory" considering the evidence adduced during discovery. *Id.* at *6. But the court concluded that moving to *Batson*'s third step would be impossible. *Id.* at *7. Because even if Harris's "stated reasons" for each disputed strike were his "actual reasons," the court reasoned that it could not "sufficiently reconstruct all relevant circumstances in a way that would permit [the court] to meaningfully apply *Batson*'s third step." *Id.* On that basis, the district court entered judgment granting Johnson conditional habeas relief, according to our remand instructions. *Id.* at *8.

William "Chris" Rankins, proceeding in his official capacity as Acting Warden of the Great Plains Correctional Center, timely appealed the judgment on behalf of the state. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we reverse and remand.[4]

## STANDARD OF REVIEW

We review the district court's decision to deny an evidentiary hearing for an abuse of discretion. *See Marquez v. City of Albuquerque*, 399 F.3d 1216,

---

[4] This court granted a motion by the appellant to stay pending appeal the district court's order that conditionally granted Johnson habeas relief and ordered his release from state custody unless the state granted him a new trial.

1224 (10th Cir. 2005). Of that ilk is the decision to hold a *Batson* reconstruction hearing. *See, e.g.*, *Dolphy v. Mantello*, 552 F.3d 236, 240 (2d Cir. 2009).

## DISCUSSION

Our focus here is singular. We consider whether the district court abused its discretion in declining to hold a *Batson* reconstruction hearing under an "impossible or unsatisfactory" standard. *Johnson*, 3 F.4th at 1227 (quoting *Jordan v. Lefevre*, 206 F.3d 196, 202 (2d Cir. 2000)). Principally, this standard asks the district court to consider whether the "passage of time" or "other circumstances" would inhibit the court's ability to hold a reconstruction hearing. *See id.* (quoting same); *see also Snyder v. Louisiana*, 552 U.S. 472, 486 (2008) (ascertaining that, "more than a decade after petitioner's trial," there was no "realistic possibility" of reconstructing the "subtl[ties]" surrounding the prosecutor's motives to strike); *United States v. McMath*, 559 F.3d 657, 666 (7th Cir. 2009) (remanding "for the district judge to make findings of fact" on the *Batson* issue, unless "the passage of time preclude[d] the district court from [doing so]"); *Riley v. Taylor*, 277 F.3d 261, 294 (3d Cir. 2001) (recognizing that a new trial may be appropriate in lieu of a reconstruction hearing depending on "the passage of time" (citation omitted)). The merits of Johnson's *Batson* claim do not weigh on this narrow issue. Our previous opinion establishes as law of the case (1) that Johnson satisfied *Batson*'s first step by making a prima facie case of racially motivated

peremptory strikes and (2) that the district court erred when it failed to formally conduct *Batson*'s second step. *Johnson*, 3 F.4th at 1226–27; *see United States v. Trent*, 884 F.3d 985, 994 (10th Cir. 2018) ("Under the law of the case doctrine, when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (cleaned up)). Those issues being resolved, we pick this case up where we left off: the possibility of holding a *Batson* reconstruction hearing on this case record. *Johnson*, 3 F.4th at 1227. Having studied the record, we conclude that the court abused its discretion in deciding that a reconstruction hearing would be "impossible and unsatisfactory." *Johnson*, 2023 WL 5055491, at \*1. The discovery conducted at the district court's behest yielded sufficient information for the court to hold a *Batson* reconstruction hearing at step two.

To start, the state acquired data about the racial and ethnic identities of all venirepersons, which the district court sought specifically in its discovery order. The state gathered the driver's licenses of all 33 venirepersons and telephoned most of them (some were unreachable) to ask about their self-identified race, ethnicity, and English-language proficiency. This investigation revealed that, of the 33 venirepersons, three were Black, one was Native American, and the remainder were white, according to their driver's licenses. Of those listed as "White" on their driver's licenses, a few identified with other racial or ethnic identities. App. vol. VIII, at 2101–06. For the six stricken jurors, the state obtained the following information:

10

1. Tawil: Driver's license reports his race as "White," he self-identifies as white, and he speaks English fluently as his second language, *id.* at 2135;
2. Dickens: Driver's license reports his race as "Black or African American," he self-identifies as "African American," and he speaks English as his first language, *id.* at 2102, 2114;
3. de Wassom: Driver's license reports her race as "White," she self-identifies as "Mexican," and she speaks English as her second language, *id.* at 2105, 2136;
4. Wilson: Driver's license reports her race as "White," she self-identifies as white, and she speaks English as her first language, *id.* at 2138;
5. Carranza: Driver's license reports her race as "White," she could not be reached by phone to self-report her racial or ethnic identity, and she stated during voir dire that she speaks English as her second language, *id.* at 2112;
6. Martinez: Driver's license reports her race as "White," she self-identifies as white, and she speaks English as her first language, *id.* at 2122.

As to the remaining venirepersons, the demographic information produced by the state shows that one of the Black prospective jurors (Williams) was empaneled after the trial court rejected the state's peremptory strike,[5] one of the Black prospective jurors (Sweet) served as an alternate, the sole Native

---

[5] When Harris moved to strike prospective juror Williams, Harris stated preemptively: "I understand she's African American, but our race neutral reason for her is she's a pastor." App. vol. I, at 231. The trial judge rejected this strike, which he thought "would have effectively eliminated all African Americans" from the jury. *Id.* The trial judge later acknowledged at sentencing that this rationale for keeping Williams on the jury had been an error to the detriment of the state. On direct appeal, the OCCA determined that the trial judge's error did not warrant reversal because the Williams strike had nevertheless been supported by a race-neutral reason. This determination by the OCCA factored into our previous decision that the OCCA had "plainly misapprehended or misstated the record" when it said the trial court had accepted the state's proffered race-neutral reasons for its strikes. *Johnson*, 3 F.4th at 1224 (cleaned up).

American prospective juror (Nichols) was stricken on the state's eighth peremptory challenge with no protest from Johnson, and one of the prospective jurors (Perez) who self-identifies as "Hispanic" was empaneled with no challenge from the state. App. vol. VIII, at 2104. The discovery confirms that the rest of the empaneled jury was racially white, both according to their driver's licenses and self-identification. This thorough reporting should have allayed the district court's concerns about "lack[ing] the circumstantial information necessary to contextualize the prosecutor's stated reasons for the challenged strikes." App. vol. VII, at 2047. The court asked for context, and it appears that the state delivered.

Next, we consider Harris and Drummond's contemporaneous, handwritten notes from voir dire. Even though the trial judge never prompted the prosecution for race-neutral reasons, a record was nevertheless created through the prosecutors' notes. *See Paulino v. Harrison*, 542 F.3d 692, 700 (9th Cir. 2008) ("Evidence of a prosecutor's actual reasons may be direct or circumstantial."). Bringing these notes to life, Harris and Drummond's deposition testimonies explained the significance of certain notations, such as marking a prospective juror's name with a "?" (to indicate concern and a possible desire to strike) or designating a juror's name with the letter "J" (to signal prior jury service). App. vol. VIII, at 2197, 2213. Unlike other cases where courts (rightly) refuse to speculate about a prosecutor's actual reasons for striking a prospective juror, the district court had access to handwritten

12

notes seldom available ten-plus years after trial. *See Paulino*, 542 F.3d at 700 (concluding that the state's mere speculation about its race-neutral reasons without any recollection or record from the prosecutor failed *Batson*'s second step); *Holloway v. Horn*, 355 F.3d 707, 725 (3d Cir. 2004) (determining that the state's "speculation," based on the voir dire transcript, about the prosecutor's actual reasons for striking a juror was inadequate).

Finally, the state obtained depositions from all the major players in Johnson's trial: now-retired Judge Gillert (then state trial judge), now-Judge Drummond (then assistant prosecutor), Lyons (defense attorney), and Harris (lead prosecutor). Not only were all available to testify, a rarity in itself, but all deponents recalled the case in great detail. The trial's prominence in the Tulsa community and notable publicity made Johnson's trial a standout in some of the deponents' memories. For example, in his deposition Harris testified that the trial was memorable because the case was high-profile, he had effectively tried the case three separate times against different codefendants, and he had faced threats to his life during the trial—all facts that would be relevant to an assessment of Harris's credibility and his purported motivations for striking jurors at a *Batson* hearing. Specifically as to the peremptory strikes, Harris testified thoroughly about his race-neutral reasons for striking each of the six

challenged jurors.[6] Harris described the jurors' demeanors, facial expressions, and other factors (i.e., profession, education level, English-language proficiency) that contributed to his decision in exercising the strikes.

Despite Harris's vivid recollections, the court identified several specific "circumstances" as being ill-suited to reconstruction. *Johnson*, 2023 WL 5055491, at *7. These included Harris's "perception[s]" about the dynamic between certain jurors, "visual observation[s]," remarks about jurors' "facial expression[s]," "attitude[s]," and "tone," along with other "[d]emeanor-based explanations." *Id.* In the court's mind, even if Harris testified to his subjective impressions at a reconstruction hearing, its ability to assess Harris's credibility ten years after the fact would be no match for the trial court's firsthand observations. *Id.* Because ten years had passed since Johnson's trial, the court concluded that Johnson could not be "reasonably expect[ed] . . . to 'show any weaknesses' in Harris's demeanor-based justifications" at a *Batson* reconstruction hearing, just like the court could not be reasonably expected to "meaningfully assess" whether Harris's stated justifications were "merely pretext for purposeful discrimination." *Id.*

This discussion suggests that the district court misdirected the "impossible or unsatisfactory" inquiry to the wrong step of *Batson*. The court's

---

[6] Johnson claimed that the six strikes established a *pattern*, though a pattern is not required to satisfy *Batson*'s first step, only an inference of discriminatory intent must be shown. *Cortez-Lazcano v. Whitten*, 81 F.4th 1074, 1088 (10th Cir. 2023).

concerns all pertained to its ability to make a ruling at step three, not the possibility of holding a hearing at step two.[7] *Cf. Purkett v. Elem*, 514 U.S. 765, 768 (1995) (determining that the circuit court "erred by combining *Batson*'s second and third steps into one" because the plausibility of the state's race-neutral explanations do not "become[] relevant" "until the *third* step"). The district court even recognized that a reconstruction hearing at step two was "[a]rguably" possible based on the discovery. *Johnson*, 2023 WL 5055491, at *6. By focusing on the feasibility of making credibility determinations, the district court put the step-three cart before the step-two horse.

Similarly, Johnson argues that several circumstances of the trial "cannot be reconstructed," such as Harris's "personal perceptions" about jurors' facial expressions, attitude, and tone, as well as the racially charged atmosphere in

---

[7] Before the district court, Johnson argued that the state had waived its right to a *Batson* reconstruction hearing and that no Supreme Court decision had recognized reconstruction hearings as "a legitimate legal mode of analysis to salvage a *Batson* claim." App. vol. VIII, at 2265. Johnson raised these same arguments to this court in his petition for rehearing and before the Supreme Court in his petition for certiorari. He makes these points again in this appeal. Our previous decision remanding the case with instruction for the district court to hold a *Batson* reconstruction hearing demonstrates our disagreement with Johnson on the legitimacy of that procedure. *See Johnson*, 3 F.4th at 1227. That and the previous dispositions in this case resolve Johnson's waiver arguments. *See Est. of Cummings by & through Montoya v. Cmty. Health Sys., Inc.*, 881 F.3d 793, 801 (10th Cir. 2018) ("A lower court is bound to carry the mandate of the upper court into execution and cannot consider the questions which the mandate laid to rest." (cleaned up)); *cf. Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1140 (10th Cir. 2009) (noting that "[w]e depart from the [law of the case] doctrine only in . . . exceptionally narrow circumstances" (citation omitted)).

15

the courtroom which, according to Lyons in his deposition, made the discriminatory nature of the strikes "obvious." Resp. Br. at 26, 28. We are equally unconvinced by these arguments. Both Harris and Lyons would be available to testify at a reconstruction hearing about these subtleties. From that testimony, the district court could weigh the credibility of Harris's testimony about the jurors' demeanors against Lyons's testimony about the trial atmosphere.

The district court's (and Johnson's) concerns about reconstruction are misplaced. "[W]here a prosecutor can generally recall the trial, review contemporaneous transcripts or notes, and articulate race-neutral explanations for the challenged strikes, the issue of intent is . . . well within the province of the [district] court." *Harris v. Haeberlin*, 752 F.3d 1054, 1059 (6th Cir. 2014). With all of those ingredients present in the record, the court was well-equipped to weigh the evidence and make a call. In fact, the inordinate amount of record evidence available in this case, plus the availability of the original trial judge, prosecutor, and defense attorney, leaves us hard-pressed to imagine a case better suited to a reconstruction hearing. If a reconstruction hearing is not possible in this case, then it's hard to conceive of one where it would be. By finding a *Batson* hearing "impossible" on this case record, the district court's decision threatens to create a per se rule that reconstruction hearings are never possible years after trial. We decline to impose such a strict rule. Given the

16

ample evidence in the record, the district court applied the "impossible or unsatisfactory" standard too harshly.

All told, if a *Batson* hearing can be reconstructed at step two, then it must be, and only then does the court concern itself with step three. *See Purkett*, 514 U.S. at 768 ("[T]o say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious.").

Once the court reaches the final step of the *Batson* gauntlet, it's nearly home free. The district court is "best situated to evaluate . . . the credibility of the prosecutor who exercised [the peremptory] strikes." *Davis v. Ayala*, 576 U.S. 257, 273–74 (2015). These credibility determinations are nearly ironclad on appeal absent "exceptional circumstances." *See id.* at 274 (quoting *Snyder*, 552 U.S. at 477). Though a *Batson* reconstruction hearing conducted ten-plus years after trial presents its challenges, that does not make the procedural function of holding the hearing impossible when the record contains adequate evidence of the prosecutor's race-neutral explanations for issuing the peremptory strikes. *See Miller-El v. Dretke*, 545 U.S. 231, 231 (2005) (recognizing that the only order of business at *Batson* step two is for "the State to come forward with a neutral explanation"); *Cortez-Lazcano v. Whitten*, 81 F.4th 1074, 1083 (10th Cir. 2023) ("At [*Batson*'s] second step, nearly any race-neutral explanation will suffice, even if it is not 'persuasive, or even

plausible.'" (quoting *Purkett*, 514 U.S. at 767–68)). As was the case here.
*Compare Barnes v. Anderson*, 202 F.3d 150, 157 (2d Cir. 1999) (ordering a new trial instead of remanding for a *Batson* reconstruction hearing when the trial judge had passed away), *with Bryant v. Speckard*, 131 F.3d 1076, 1078 (2d Cir. 1997) (ruling that the state trial court had adequately reconstructed a *Batson* challenge by hearing testimony from the prosecutor about his "subjective" reasons for striking jurors and accessing "the trial court clerk's voir dire minutes"). The district court was armed with racial data about each venireperson, the prosecutors' contemporaneous notes from voir dire, and depositions from the trial counsel and judge, which made a *Batson* reconstruction hearing possible at step two. What the district court does at step three with the state's race-neutral reasons once they're presented, we leave to the court's discretion.

## CONCLUSION

We reverse and remand for further proceedings in accordance with this opinion.