**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 2, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ALONZO CORTEZ JOHNSON,

    Petitioner - Appellant,

v.

No. 19-5091

JIMMY MARTIN, Warden,

    Respondent - Appellee.
_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:16-CV-00433-JED-FHM)**
_____

James L. Hankins, Edmond, Oklahoma, for Petitioner – Appellant.

Tessa Henry, Assistant Attorney General (Mike Hunter, Attorney General, and Julia Pittman, Assistant Attorney General, on the brief), Oklahoma City, Oklahoma, for Respondent – Appellee.
_____

Before **MORITZ**, **SEYMOUR**, and **BRISCOE**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

An Oklahoma jury convicted Alonzo Johnson of murder and conspiracy to commit murder. After unsuccessfully challenging his convictions in state court, Johnson filed a 28 U.S.C § 2254 petition seeking federal habeas relief. As relevant here, he asserted that the prosecution exercised its peremptory strikes in a racially

discriminatory manner to exclude minorities from the jury, in violation of his Fourteenth Amendment rights as set forth in *Batson v. Kentucky*, 476 U.S. 79 (1986). Johnson also asserted, in relevant part, that gruesome evidence, juror misconduct, and cumulative error rendered his trial fundamentally unfair. The district court denied relief.

For the reasons explained below, we affirm the denial of relief on Johnson's gruesome-evidence, juror-misconduct, and cumulative-error claims. But because we conclude that the Oklahoma Court of Criminal Appeals (OCCA) relied on an unreasonable factual determination and unreasonably applied *Batson* to reject Johnson's *Batson* claim and further determine that Johnson raised a prima facie case of discrimination under the first step of *Batson*, we reverse the district court's denial of habeas relief on Johnson's *Batson* claim and remand for further proceedings consistent with this opinion.

## Background

Although we will add more facts as needed to our analysis below, we begin by briefly setting the scene.[1] This appeal arises from a murder-for-hire plot involving five individuals: Mohammed Aziz, Allen Shields (Allen), Fred Shields (Fred), Terrico Bethel, and Johnson. The victim was Neal Sweeney, a fuel supplier.

Sweeney's fuel marketing company supplied fuel to convenience stores, including stores owned by Aziz. As a result of a dispute involving Aziz's

---

[1] We take these undisputed facts from the district court's decision below.

2

nonpayment of bills, Sweeney obtained a default judgment against Aziz. Aziz, who

had "developed an 'intense hatred' toward Sweeney," approached Allen and asked if

Allen knew anyone who could kill someone for him. App. 30 (quoting R. vol. 1, 62).

Allen spoke to his brother, Fred, about finding someone to do the job. Fred set the

price for the murder at $10,000 and recruited Bethel to carry it out.

Fred also recruited Johnson, a cousin of the Shields brothers. Johnson

"purportedly obtained the getaway car and helped coordinate with Aziz." *Id.* Bethel

drove the car to Sweeney's office and shot Sweeney at close range, in the head.

Later, law enforcement apprehended Fred "on a different crime[,] and [he] exposed

the conspiracy" to kill Sweeney "in an effort to make a deal." *Id.* at 30–31.

The State charged Johnson with first-degree murder and conspiracy to commit

first-degree murder.[2] His defense at trial centered on arguments that his involvement

in the murder plot was minimal and that his coconspirators' testimony against him

was unreliable (Aziz testified at Johnson's trial, and the State introduced Allen's

preliminary-hearing testimony). The jury convicted Johnson on both counts. The trial

court sentenced him to life imprisonment on each count, to run consecutively.

Johnson filed a direct appeal, raising eighteen issues, and the OCCA affirmed.

*Johnson v. State*, No. F-2013-173 (Okla. Crim. App. July 17, 2014) (unpublished)

(*Johnson I*). Johnson then sought postconviction relief, which the state trial court

---

[2] The other men faced similar charges. A jury convicted Fred and Bethel of
first-degree murder, among other things, and both received life sentences. Allen
faced a conspiracy charge but died before Johnson's trial. Aziz pleaded guilty to
solicitation of murder and was sentenced to 35 years in prison.

denied. *Johnson v. State*, No. CF-2009-2738 (Tulsa Cnty. Dist. Ct. Oct. 6, 2015) (unpublished) (*Johnson II*). The OCCA affirmed the denial of postconviction relief. *Johnson v. State*, No. PC-2015-923 (Okla. Crim. App. Apr. 7, 2016) (unpublished) (*Johnson III*).

Johnson then filed the § 2254 petition underlying this appeal, raising seven claims. The district court denied the petition and declined to issue a certificate of appealability (COA). *See* 28 U.S.C. § 2253(c)(1)(A). Johnson sought to appeal to this court and filed a combined opening brief and request for a COA. We granted him a partial COA to appeal the district court's resolution of four of his seven claims: the *Batson* claim, the gruesome-evidence claim, the juror-misconduct claim, and the cumulative-error claim.[3] *See* § 2253(c)(3).

### Analysis

We review the district court's legal analysis de novo. *Smith v. Duckworth*, 824 F.3d 1233, 1241–42 (10th Cir. 2016). In so doing, we remain bound by the constraints of the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996.

---

[3] The COA order does not expressly deny a COA on Johnson's three remaining claims: (1) that the admission of Bethel's recorded statements and Allen's preliminary-hearing testimony violated his rights under the Confrontation Clause, (2) that the evidence was insufficient to support his conviction, and (3) that he was denied the right to present a defense. Perhaps recognizing the partial COA grant as an implicit denial of a COA on his remaining claims, Johnson does not reassert his desire for a COA on these claims in his reply brief. In the interest of clarity, we now expressly deny a COA on these three remaining claims, concluding that reasonable jurists could not debate the district court's resolution of them. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (holding that to obtain COA, "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong").

*Id.* at 1240–41. AEDPA requires a state prisoner seeking federal habeas relief to show that the state court's resolution of his or her claims (1) "was contrary to, or involved an unreasonable application of, clearly established [f]ederal law" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate[-]court proceeding." § 2254(d). The two prongs of § 2254(d) thus impose "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Smith*, 824 F.3d at 1241 (quoting *Burt v. Titlow*, 571 U.S. 12, 19–20 (2013)).

Under § 2254(d)(1), "[w]hether the law is clearly established is *the* threshold question." *House v. Hatch*, 527 F.3d 1010, 1015 (10th Cir. 2008). "[W]ithout clearly established federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to' or involved an 'unreasonable application' of such law." *Id.* at 1017 (quoting § 2254(d)(1)). But if such clearly established law exists, a state-court decision is contrary to it if the state court "applies a rule that contradicts the governing law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that precedent." *Smith*, 824 F.3d at 1241 (quoting *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 739 (10th Cir. 2016)). And a state-court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000).

Under § 2254(d)(2), "[w]e will not conclude a state court's factual findings are unreasonable 'merely because we would have reached a different conclusion in the first instance.'" *Smith*, 824 F.3d at 1241 (quoting *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015)). Instead, we "defer to the state court's factual determinations so long as 'reasonable minds reviewing the record might disagree about the finding in question.'" *Id.* (quoting *Brumfield*, 576 U.S. at 314). In line with this deference, we presume that a state court's factual findings are correct, "and the petitioner bears the burden of rebutting that presumption by 'clear and convincing evidence.'" *Id.* (quoting § 2254(e)(1)).[4] But "'deference does not imply abandonment or abdication of judicial review,' and 'does not by definition preclude relief.'" *Brumfield*, 576 U.S. at 314 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (*Miller-El I*)). Accordingly, "if the petitioner can show that 'the state courts plainly misapprehend[ed] or misstate[d] the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable.'" *Smith*, 824 F.3d at 1241 (alterations in original) (quoting *Ryder*, 810 F.3d at 739).

---

[4] The Supreme Court has "not yet 'defined the precise relationship between § 2254(d)(2) and § 2254(e)(1).'" *Brumfield*, 576 U.S. at 322 (quoting *Titlow*, 571 U.S. at 18). Accordingly, it is "not entirely clear whether § 2254(e)(1)'s presumption applies to our § 2254(d)(2) analysis." *Vreeland v. Zupan*, 906 F.3d 866, 880 n.3 (10th Cir. 2018). But because Johnson "appears to concede it does, we need not resolve this 'open question'" here. *Id.* (quoting *Sharp v. Rohling*, 793 F.3d 1216, 1228 n.10 (10th Cir. 2015)).

## I.     *Batson* Claim

Johnson—who is African American—argues that the district court erred in denying his claim that the prosecution used its peremptory challenges to systematically exclude racial minorities from the jury in violation of *Batson*. *Batson* held that the "Equal Protection Clause prohibits the prosecution's use of peremptory challenges to exclude potential jurors on the basis of their race." *Saiz v. Ortiz*, 392 F.3d 1166, 1171 (10th Cir. 2004). In other words, *Batson* recognized "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." 476 U.S. at 85–86.

A trial court faced with a *Batson* challenge must apply a three-step burden-shifting analysis. *See id.* at 96–98. "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, . . . the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (citation omitted). "Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Id.*

### A.     Additional Facts and Procedural Background

At Johnson's trial, the prosecutor exercised his first six peremptory challenges in the following order: (1) Dr. Tawil, (2) Mr. Dickens, (3) Ms. Aramburo de Wassom, (4) Ms. Wilson, (5) Ms. Carranza, and (6) Ms. Martinez. When the prosecutor moved to dismiss Mr. Dickens, an African American, from the jury pool,

7

the trial court asked: "Your race neutral reason?" R. vol. 3, 449. The prosecutor responded: "Judge, he has a Ph.D., [and] we're concerned about him being a professor of liberal arts. It's been my practice to not keep those types of educated people, Ph.D.s in liberal arts, on the jury. We think they're too exacting at times, too liberal." *Id.* The trial court then stated: "Well, I'll determine there's a race[-]neutral reason. There are other prospective African Americans on the jury." *Id.*

After the prosecutor moved to dismiss Ms. Martinez with his sixth strike, defense counsel stated:

> Your honor, I'd like to point out at this point that I think every peremptory challenge . . . so far[,] except Ms. Wilson[,] has been of a minority[:] Dr. Tawil, Ms. Carranza, Ms. Aramburo de Wassom, [Ms. Martinez],[5] and Mr. Dickens. And there's a pattern here, Your Honor, of striking all minorities off this jury.[6]

*Id.* at 450. The trial court responded:

> Well, I don't think that this establishes a pattern. Again, in terms of— Ms. Martinez, I won't state their reasons for them, but Ms. Martinez was patently—she was hardly involved in the process. Ms. Carranza has indicated she has difficulty with English, Ms. Aramburo de Wassom told us the same. So I do not see a pattern here.

*Id.* at 450–51.

---

[5] Defense counsel repeated "Ms. Carranza," but it appears that he intended to say "Ms. Martinez": she was the other minority female excused, and the court referred to "Ms. Martinez" in its response to defense counsel. R. vol. 3, 450.

[6] The record does not reveal the specific race of any of these six jurors except for Mr. Dickens, who the court identified as African American. But when defense counsel identified five of these six jurors as minorities, neither the trial court nor the prosecutor disputed that characterization.

8

The prosecutor next sought to excuse Ms. Williams, stating—without being prompted by either a defense objection or a question from the trial court—that although Ms. Williams was "African American, . . . [the] race[-]neutral reason for her is she's a pastor. I think pastors traditionally are very, very forgiving, [and] have trouble with judgment. She's worked with drug addicts and counseled them in the past[,] showing . . . a propensity towards treatment rather than judgment." *Id.* at 452. The trial court interrupted this explanation and said, "Well, you would have effectively eliminated all the African Americans[,] and I'm not going to do that." *Id.*

Later, at sentencing, the trial court stated that it "probably made an error during the voir dire to the detriment . . . of the State when" the prosecutor sought to excuse Ms. Williams. R. vol. 5, 758. Specifically, the trial court explained that it had recently been reminded that the absence of any minorities on the jury "was not a basis to prevent a strike"; instead, "there needed to be a finding that there was either [a] systematic or [a] specific discriminatory practice." *Id.* at 759. Thus, because the absence of any minorities was the rationale for the trial court's decision to reject the prosecutor's peremptory challenge to Ms. Williams, the trial court acknowledged that it "made an error." *Id.*

Johnson then raised his *Batson* challenge on direct appeal, arguing that the "prosecutor systematically removed minorities from the jury." R. vol. 1, 181. Rejecting this argument in a single paragraph, the OCCA first stated "the trial court did not abuse its discretion when it found that the State did not engage in systemic or specific discrimination." *Johnson I*, slip op. at 3. The OCCA then acknowledged the

9

trial court's error in refusing to allow the prosecutor to excuse Ms. Williams and further noted that "the trial court's determination that the State's explanations for excusing each of the minority jurors were legitimate race-neutral reasons is not clearly against the logic and effects of the facts presented." *Id.* Last, the OCCA concluded that Johnson was not entitled to relief because he had "failed to establish purposeful discrimination on the part of the State." *Id.*

Johnson again asserted his *Batson* claim in his state-court application for postconviction relief. Both the state trial court and the OCCA held that because Johnson brought his *Batson* claim on direct appeal, consideration of its merits in postconviction proceedings was barred by res judicata. *Johnson II*, slip op. at 7; *Johnson III*, slip op. at 3.

Reviewing the OCCA's adjudication of this claim, the district court began with the proposition that "[b]ecause the OCCA applied *Batson*, relief is only available if it 'was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge.'" App. 35 (quoting *Collins*, 546 U.S. at 338). Additionally, the district court relied on *Black v. Workman* for the proposition that a habeas court must "defer to the state trial judge's finding of no racial motivation 'in the absence of exceptional circumstances.'" 682 F.3d 880, 897 (10th Cir. 2012) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). The district court then determined that no exceptional circumstances existed here. In so doing, the district court specifically noted the prosecutor's explanation for striking Mr. Dickens (he had a Ph.D.). It also determined that the record supported the explanations provided by the trial court for the dismissal

10

of the other minority jurors. Accordingly, it found no evidence of racial motivation and declined to "disturb the OCCA's application of *Batson*." App. 36.

## B.     Discussion

On appeal, Johnson contends that the district court erred by mischaracterizing his *Batson* claim as arising under step three of *Batson*. In so doing, Johnson renews the second-step *Batson* argument he raised in his habeas petition. And he further asserts—as required by the barrier imposed by § 2254(d)—that the OCCA (1) unreasonably applied *Batson* in finding the second step satisfied where the trial court, rather than the prosecutor, supplied race-neutral reasons for the strikes at issue and (2) found and relied on an unreasonable fact when it determined that the prosecutor supplied race-neutral reasons for the challenged strikes.

### 1.     The State's Arguments

Before turning to Johnson's arguments, we first address and reject two points raised by the State.

### i.     Procedural Bar

The State suggests in passing[7] that this court should not consider Johnson's *Batson* claim because he failed to raise it in his direct appeal to the OCCA. In so

---

[7] Specifically, the State devotes two sentences to this argument, asserting that because Johnson "did not make this argument to the OCCA on direct appeal," it "would be improper" for us to consider it now. Aplee. Br. 19. In support, the State cites only *Sexton v. Beaudreaux*, a case that did not concern procedural bar. 138 S. Ct. 2555, 2560 (2018) (per curiam) (noting in passing that Ninth Circuit erred when it "considered arguments against the state court's decision that [petitioner] never even made in his state habeas petition").

11

doing, the State appears to be asserting a two-part procedural-bar argument: (1) Johnson did not raise his specific step-two *Batson* argument in his direct appeal, and (2) when he raised it in his application for postconviction relief, the OCCA implicitly rejected it on waiver grounds as an argument that could have been but was not raised on direct appeal. *See Harmon v. Sharp*, 936 F.3d 1044, 1060 (10th Cir. 2019) (noting that "[o]n habeas review, this court does not address issues that have been defaulted in state court on an independent and adequate state procedural ground" (quoting *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998))); *Logan v. State*, 293 P.3d 969, 973 (Okla. Crim. App. 2013) (providing that in Oklahoma postconviction proceedings, "issues that were not raised previously on direct appeal, but which could have been raised, are waived").

We reject this argument because, according to both the state trial court and the OCCA, Johnson *did* raise his *Batson* claim on direct appeal. *See Johnson II*, slip op. at 7; *Johnson III*, slip op. at 3. Indeed, the State acknowledged as much below, noting that (1) Johnson "raised this claim on direct appeal to the OCCA" and "[t]he OCCA addressed the claim on the merits and denied . . . relief," and (2) Johnson "*also* raised this claim in his post[]conviction proceeding[,] but the OCCA, *noting the claim had been previously raised and addressed in* [*Johnson*]*'s direct appeal*, declined to again address the claim as it was 'barred as res judicata.'" R. vol. 1, 127 & n.7 (emphases added) (quoting *Johnson III*, slip op. at 3). Given that the state courts determined this particular argument was raised on direct appeal, we reject the State's procedural-bar argument.

12

### ii. Type of *Batson* Error

The State next contends that Johnson is not entitled to habeas relief because he alleges trial-court error at the second step of *Batson*, but the trial court's ruling stopped at the first step of *Batson*. In other words, the State contends that the trial court's response to defense counsel's objection about a pattern of striking minorities amounted to a ruling that defense counsel failed to establish a prima facie case of discrimination. Thus, continues the State, the *Batson* inquiry never proceeded to the second step, and no second-step error could have occurred.

Although the State's interpretation may be plausible, we ultimately reject it. Recall that after the State's sixth peremptory challenge, defense counsel objected that "there's a pattern here . . . of striking all minorities off this jury." R. vol. 3, 450. The trial court responded:

> Well, I don't think that this establishes a pattern. Again, in terms of—
> Ms. Martinez, I won't state their reasons for them, but Ms. Martinez
> was patently—she was hardly involved in the process. Ms. Carranza has
> indicated she has difficulty with English, Ms. Aramburo de Wassom
> told us the same. So I do not see a pattern here.

*Id.* at 450–51. In these four sentences, the trial court stated at the beginning and at the end that there was no pattern of discrimination. The State contends that this conclusion, combined with the trial court's decision not to ask the prosecutor for race-neutral reasons, "was an implicit ruling that [Johnson] failed to make a prima facie showing that the State's use of peremptory challenges . . . showed a pattern of discrimination." Aplee. Br. 20; *see also Saiz*, 392 F.3d at 1177–78 (noting that "initial obligation under *Batson* [is] to make a prima facie showing that the

13

prosecution's peremptory strikes were discriminatory" and "infer[ring] from the trial court's decision not to go on to step two of the *Batson* analysis (asking the prosecution to explain its peremptory strike) that it concluded that [the defendant] had failed to establish a prima facie case of discrimination").

But critically, the State's proposed interpretation of the trial court's ruling is contrary to the OCCA's interpretation. In rejecting Johnson's *Batson* claim, the OCCA specifically approved the trial court's procedure at the second (and third) step of *Batson* when it stated the "trial court's determination that the State's explanations for excusing each of the minority jurors were legitimate race-neutral reasons is not clearly against the logic and effects of the facts presented." *Johnson I*, slip op. at 3. Because the OCCA treated the trial court's ruling as going beyond the first step of *Batson*, we reject the State's proposed interpretation of the trial court's ruling as limited to *Batson*'s first step.

### 2. Johnson's Arguments

Having rejected the State's overarching arguments in favor of affirming the district court's denial of habeas relief on Johnson's *Batson* claim, we now turn to Johnson's arguments in favor of reversal.

### i. The District Court's Decision

As an initial matter, we agree with Johnson that the district court erred by treating his *Batson* claim as aimed at the third step of *Batson*. Johnson plainly asserted in his habeas petition that the trial court erred at the second step of *Batson* by failing to ask the prosecutor for race-neutral reasons. But to reject his claim, the

14

district court relied on *Black* and *Snyder*, which addressed challenges to rulings at the third step of the *Batson* analysis. *See Black*, 682 F.3d at 895–96 (noting that "the prosecutor's explanation satisfied step two of the *Batson* three-step process" and moving on to "determine whether 'it was unreasonable to credit the prosecutor's race-neutral explanations'" (quoting *Collins*, 546 U.S. at 338)); *Snyder*, 552 U.S. at 479, 484–85 (considering plausibility of "the prosecution's two proffered grounds for striking" juror and noting that "the question presented at the third stage of the *Batson* inquiry is 'whether the defendant has shown purposeful discrimination'" (quoting *Miller-El v. Dretke*, 545 U.S. 231, 277 (2005) (*Miller-El II*) (Thomas, J., dissenting))). Accordingly, in our de novo review of the district court's legal analysis, we depart from the district court's step-three analysis and focus specifically on Johnson's step-two argument. *See Smith*, 824 F.3d at 1241–42.

### ii.    § 2254(d)

To obtain habeas relief, Johnson must first pass through the barrier imposed by § 2254(d). On this point, Johnson advances arguments under both prongs, asserting that the OCCA denied relief based on an unreasonable application of *Batson* under subsection (d)(1) and an unreasonable determination of the facts under subsection (d)(2). *See* § 2254(d). Recall, again, that the OCCA's discussion of Johnson's *Batson* claim spanned only three substantive sentences:

> We find that the trial court did not abuse its discretion when it found that the State did not engage in systemic or specific discrimination. Although the trial court erred to the detriment of the State when it refused to permit the prosecutor to excuse an African-American juror because it would have left the jury without any African-Americans, *we*

15

*find that the trial court's determination that the State's explanations for*
*excusing each of the minority jurors were legitimate race-neutral*
*reasons* is not clearly against the logic and effects of the facts presented.
As [Johnson] ultimately failed to establish purposeful discrimination on
the part of the State[,] no relief is required.

*Johnson I*, slip op. at 3 (emphasis added) (citations omitted). Clearly, in the second of

these three sentences, the OCCA expressly approved of the trial court's

determination that the prosecutor's "*explanations* for excusing *each* of the minority

jurors were legitimate race-neutral *reasons*." *Id.* (emphases added).

But this conclusion is factually incorrect. The record plainly shows that the

trial court only determined that *one* explanation offered by the prosecutor for

excusing *one* minority juror was a legitimate race-neutral *reason*: it accepted that the

prosecutor struck Mr. Dickens because he had a Ph.D. The prosecutor did not offer

any reasons for his next set of strikes. Instead, the trial court provided its *own* reasons

for the strikes, speculating as to what the prosecutor's reasons might have been. And

paradoxically, it did so after declaring that it would not "state [the prosecutor's]

reasons." R. vol. 3, 450. The trial court also later rejected the prosecutor's proffered

reason for striking Ms. Williams.[8]

Accordingly, Johnson has shown by clear and convincing evidence that the

OCCA "plainly misapprehend[ed] or misstate[d] the record" when it purported to

---

[8] The trial court eventually concluded that it could have and perhaps should
have accepted the prosecutor's reason for striking Ms. Williams. But such belated
recognition does not change what happened during jury selection, which was that the
trial court rejected the prosecutor's proffered reason and did not allow the prosecutor
to strike Ms. Williams.

16

approve the trial court's acceptance of the prosecutor's multiple race-neutral reasons for his strikes—in reality, the trial court accepted only one such reason from the prosecutor and merely speculated as to the other reasons, which it supplied itself. *Smith*, 824 F.3d at 1241 (alterations in original) (quoting *Ryder*, 810 F.3d at 739); *see also* § 2254(d)(2), (e)(1). The OCCA then relied on this unreasonable factual determination to reject Johnson's *Batson* challenge and find no purposeful discrimination. *See Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (emphasizing that "to receive relief under [§ 2254(d)(2)], the petitioner must show that the state court's adjudication of the claim 'resulted in a decision that was *based on* an unreasonable determination of the facts in light of the evidence presented'" (quoting § 2254(d)(2))).

Moreover, to the extent that the OCCA considered the trial court's sua sponte speculation about potential race-neutral reasons as part of the *Batson* analysis, doing so was an unreasonable application of *Batson*. The second step of *Batson* specifically requires "[t]he prosecutor . . . [to] articulate a neutral explanation related to the particular case to be tried." 476 U.S. at 97–98 (emphasis added); *see also Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) ("As the *Batson* Court explained and as the Court later reiterated, once a prima facie case of racial discrimination has been established, *the prosecutor must provide* race-neutral reasons for the strikes." (emphasis added)). And *Batson* means what it says: the court must ask the prosecutor to provide reasons, rather than merely speculating about what such reasons might be. *See Johnson v. California*, 545 U.S. 162, 172 (2005) ("The inherent uncertainty

17

present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question."); *Flowers*, 139 S. Ct. at 2244 ("The Court has explained that 'the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge.'" (quoting *Snyder*, 552 U.S. at 477)); *Holloway v. Horn*, 355 F.3d 707, 725 (3d Cir. 2004) (noting that speculation "does not aid our inquiry into the reasons the prosecutor actually harbored" for peremptory strike).

Thus, when a trial court offers its own speculation as to the prosecutor's reasons for striking minority jurors, it essentially disregards its own core function under *Batson*—to evaluate the reasons offered by the prosecutor, including the prosecutor's demeanor and other contextual information, in order to determine the prosecutor's true intent. *See Flowers*, 139 S. Ct. at 2243–44. And in that regard, it matters not a whit that the trial court may have offered perfectly good reasons for striking the minority jurors. As the Ninth Circuit explained in a factually analogous case, "it does not matter that the prosecutor might have had good reasons to strike the prospective jurors. What matters is the *real* reason they were stricken." *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004) (*Paulino I*); *see also id.* at 1089–90 (finding that trial court "clearly contravened" *Batson* when it "offered, sua sponte, its speculation as to why the prosecutor may have struck the five potential jurors in question"). Similarly, the Third Circuit faulted a state appellate court for "conflat[ing] steps one and two of the *Batson* analysis in the sense that it identified and then analyzed potential justifications for the challenged strikes—something that

18

should not occur until step two—in its step[-]one analysis of whether [petitioner] had successfully established a prima facie case." *Hardcastle v. Horn*, 368 F.3d 246, 256 (3d Cir. 2004); *see also id.* at 261 (noting "the *Batson* Court's emphasis on the subjective intent of the prosecutor").

In line with these authorities, we hold that the OCCA's reliance on the trial court's sua sponte speculation about the prosecutor's reasons was an unreasonable application of *Batson* to Johnson's claim of discriminatory peremptory strikes. *See Brinson v. Vaughn*, 398 F.3d 225, 233 (3d Cir. 2005) (finding that state court unreasonably applied *Batson* to reject claim of discriminatory strikes where "the trial judge did not follow the three-step process outlined in *Batson*," including by "not call[ing] upon the prosecutor to state his reasons for the contested strikes"). Simply put, because *Batson* mandates that the prosecutor supply the race-neutral reasons, it was not reasonable for the OCCA to accept the trial court's speculation about those reasons in lieu of the prosecutor's actual reasons.

### iii. The *Batson* Test

Because the OCCA based its decision on an unreasonable factual finding and also unreasonably applied *Batson*, we review Johnson's *Batson* claim de novo, without deferring to the OCCA. *See Milton v. Miller*, 744 F.3d 660, 670–71 (10th Cir. 2014) (explaining that if petitioner satisfies § 2254(d)(1), federal habeas court reviews petitioner's claim de novo, "rather than deferring to the OCCA's resolution of that claim"); *Byrd*, 645 F.3d at 1172 (explaining that if petitioner satisfies § 2254(d)(2), we review claim de novo and without AEDPA deference).

19

Under the first step of *Batson*, Johnson "must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Johnson*, 545 U.S. at 168 (quoting *Batson*, 476 U.S. at 93–94). This step is not "so onerous that a defendant would have to persuade the judge—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination." *Id.* at 170. On the contrary, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.* And "the methods by which prima facie cases c[an] be proved" are "permissive." *Id.* at 169 n.5.

Here, to establish an inference of discrimination, Johnson primarily alleges a pattern of discrimination in which the prosecutor used five of his first six peremptory strikes to excuse minority jurors.[9] And a prosecutor's pattern of strikes against minority jurors is enough, on its own, to establish a prima facie case of discrimination. *See Batson*, 476 U.S. at 97; *Paulino I*, 371 F.3d at 1092 (finding that "the excusal of five out of six black jurors by means of five out of six peremptories" was sufficient "pattern of strikes t[o] raise[] a plausible inference of discrimination");

---

[9] Johnson further supports his position by noting the prosecutor's later failed attempt to remove Ms. Williams, the last remaining African American, from the jury. Although this attempt might support an inference of discrimination, we do not consider it here because we are concerned with the facts as they existed at the time of Johnson's objection and before the prosecutor's attempt to strike Ms. Williams. *See Paulino I*, 371 F.3d at 1091 (evaluating prima facie case of discrimination by "looking at the pattern of strikes only at the time of [the] objection").

*Brinson*, 398 F.3d at 234–35 (concluding that "[t]he pattern of strikes alleged by the defense is alone sufficient to establish a prima facie case" when prosecutor "used 13 of 14 strikes against African Americans"); *Holloway*, 355 F.3d at 722 (finding prima facie case established when prosecutor used 11 of 12 strikes against African Americans).

Nevertheless, the State contends that there is no inference of discrimination here because Johnson "did not even make a record as to the races" of each of the jurors at issue. Aplee. Br. 21. But as Johnson replies, neither the trial court nor the prosecutor objected to defense counsel's representation that the prosecutor had used five of six strikes against minorities. On the contrary, the trial court implicitly accepted that representation by responding with its own race-neutral reasons for why the prosecutor might have struck three of the jurors at issue. Moreover, as the State acknowledges, "racial identity between the defendant and the excused prospective juror is not necessary for a *Batson* claim." *Id.* (emphasis omitted); *see also Powers v. Ohio*, 499 U.S. 400, 416 (1991) (holding that *Batson* does not require racial identity between defendant and prospective juror). Thus, the absence of a record as to the specific racial makeup of the five minority jurors is not fatal to Johnson's prima facie case of discrimination.

The State further argues that Johnson fails to establish a prima facie case of discrimination because "there were obvious reasons for . . . dismissal that prevented a prima facie showing," including that two of the excused jurors had difficulty with English and that one did not want to be a juror. Aplee. Br. 21. But even if we can

21

consider such allegedly obvious reasons in assessing Johnson's prima facie case, those reasons do not significantly undermine Johnson's prima facie case as they did in the cases the State relies on. For example, in *Johnson v. Campbell*, the Ninth Circuit found no prima facie showing of discrimination based in part on "an obvious neutral reason for the challenge." 92 F.3d 951, 953 (9th Cir. 1996). But that "obvious neutral reason" played a significant role in undoing any inference of discrimination because of the weakness of the prima facie case to begin with: the *Batson* challenge involved only a single juror allegedly struck because of his sexual orientation. *Id.* Here, by contrast, Johnson has pointed to a pattern of striking five of six minority prospective jurors.[10] Accordingly, we reject the State's arguments and conclude that the clear pattern of strikes against five of six minority jurors establishes an inference of discrimination.

Thus, Johnson has made a prima facie showing of racial discrimination under *Batson*. *See* 476 U.S. at 97. Although such a showing "does not necessarily establish racial discrimination," it "is more than sufficient to require a trial court to proceed to step two of the *Batson* procedure." *Brinson*, 398 F.3d at 235. Yet the trial court did not do so, "relying instead on its own speculation as to what might have been the

---

[10] The State also cites *Capers v. Singletary*, 989 F.2d 442 (11th Cir. 1993), and *United States v. Dennis*, 804 F.2d 1208 (11th Cir. 1986) (per curiam). We find *Capers* unpersuasive here because it applied *Swain v. Alabama*, 380 U.S. 202 (1965), which *Batson* overruled. *See Capers*, 989 F.2d at 444 & n.2. And the court in *Dennis* did not, contrary to the State's assertion, consider any obvious neutral reasons at the prima facie stage. *See* 804 F.2d at 1211. It therefore does not support the State's argument on this point.

22

prosecutor's reasons." *Paulino I*, 371 F.3d at 1092. We therefore conclude that the trial court erred.

### iv. Remedy

But this error does not automatically entitle Johnson to habeas relief. Because no court later held an evidentiary hearing, the State has never presented evidence of the prosecutor's actual, nondiscriminatory reasons for striking the five minority jurors. *See id.* In this circumstance, it is not "appropriate to take the extraordinary step of granting habeas corpus relief without first providing the [S]tate with a hearing at which it could offer evidence in support of the challenged strikes." *Hardcastle*, 368 F.3d at 261. Instead, the better path is to remand for an evidentiary hearing to provide the State with "a chance to present evidence in support of its peremptory strikes." *Id.* at 250; *see also Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1339 (11th Cir. 2012) (*Madison I*) (finding unreasonable application of *Batson* and prima facie case of discrimination; "remand[ing] the case for the district court to complete the final two steps of the *Batson* proceedings").

We therefore reverse the district court's ruling on Johnson's *Batson* claim and remand to the district court for a *Batson* reconstruction hearing. *See Paulino v. Harrison*, 542 F.3d 692, 700 (9th Cir. 2008) (*Paulino II*); *cf. United States v. Chalan*, 812 F.2d 1302, 1314 (10th Cir. 1987) (remanding for district court to conduct hearing on prosecutor's reasons for strike where defendant was convicted pre-*Batson* such that "neither the trial court nor the parties were aware of the standards to be used in evaluating the . . . proffered reasons for striking [the juror]"). A *Batson*

23

reconstruction hearing is "an evidentiary hearing that takes place some[]time after the trial, where the prosecutor testifies to [his or] her actual reasons for striking the venire[ ]members in question, or the State presents circumstantial evidence of those reasons." *Paulino II*, 542 F.2d at 1314; *see also Madison v. Comm'r, Ala. Dep't of Corr.*, 761 F.3d 1240, 1249–50 (11th Cir. 2014) (*Madison II*) (explaining that *Batson* reconstruction hearing is proper and not contrary to anything in *Cullen v. Pinholster*, 563 U.S. 170 (2011), "or any other principle of habeas corpus").

Before conducting such a hearing, the district court should consider whether the passage of over eight years since Johnson's trial or any other circumstances have made such an inquiry "impossible or unsatisfactory." *Jordan v. Lefevre*, 206 F.3d 196, 202 (2d Cir. 2000). If the district court concludes that a *Batson* reconstruction hearing is impossible or unsatisfactory, it must grant habeas relief in the form of an order that Johnson be released from custody unless the State grants him a new trial within 120 days from the entry of the district court's order. *See id.* (noting that if district court decides *Batson* reconstruction hearing is not possible, it should "order that the state grant [petitioner] a new trial"); *Miller-El II*, 545 U.S. at 266 (granting relief on *Batson* claim and "remand[ing] for entry of judgment for petitioner together with orders of appropriate relief"), *decision on remand*, 142 F. App'x 802, 803 (5th Cir. 2005) (unpublished) (remanding to district court to enter order directing petitioner's release "from custody unless the State grants [him] a new trial within 120 days from the date of the entry of the district court's order").

24

If the district court determines that a *Batson* reconstruction hearing will not be impossible or unsatisfactory, it shall conduct one, thereby providing the State with an opportunity to present evidence as to the prosecutor's race-neutral reasons for the challenged strikes. *See Brinson*, 398 F.3d at 235; *Paulino I*, 371 F.3d at 1092; *Hardcastle*, 368 F.3d at 250; *Jordan*, 206 F.3d at 202; *Madison I*, 677 F.3d at 1339. The district court should then make findings at the third step of *Batson* as to whether the strikes were based on race. *See Brinson*, 398 F.3d at 235; *Paulino II*, 542 F.3d at 702 (holding that even if prosecutor fails to come forward with step-two reason, trial court must complete step three). If the district court concludes that Johnson has not met his ultimate burden of showing purposeful discrimination, it should deny Johnson's claim. But if Johnson can show purposeful discrimination, the district court should grant habeas relief as described above, ordering Johnson released unless retried within a limited period of time.[11]

---

[11] Although the parties do not discuss as much, there appears to be some dispute about where a *Batson* reconstruction hearing can or should take place. The Second Circuit, without explanation, has said that the district court may either conduct the hearing itself or remand the case to state court via a conditional writ to hold the hearing. *See, e.g.*, *Galarza v. Keane*, 252 F.3d 630, 640–41 (2d Cir. 2001); *Tankleff v. Senkowski*, 135 F.3d 235, 250 (2d Cir. 1998). But at this point, Johnson has established only a prima facie case of discrimination. In this situation, we cannot grant a writ of habeas corpus, even conditionally, "because we cannot hold as a matter of law, on the undeveloped record in this case, that [Johnson] is entitled to habeas relief." *Keller v. Petsock*, 853 F.2d 1122, 1129–30 (3d Cir. 1988); *see also* § 2254(a) (providing that state prisoner may obtain writ in federal court "only on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States"); *Billiot v. Puckett*, 135 F.3d 311, 316 n.5 (5th Cir. 1998) (explaining "that a federal habeas court cannot 'remand' a case to the state courts"; it can only grant writ of habeas corpus, conditionally or otherwise). As such, we agree with the Third Circuit that in these circumstances, § 2254 does not

## II.    Gruesome Evidence

Johnson next argues that the introduction of gruesome evidence about the murder and crime scene prejudiced him and resulted in a fundamentally unfair trial. At trial, Johnson unsuccessfully objected to the introduction of this evidence, which included: (1) testimony from a witness who explained that she used a jacket to stem the blood from Sweeney's head while waiting for the paramedics to arrive, as well as a photograph of the jacket; (2) testimony describing the crime scene, including the statement that "there was blood everywhere, and . . . some of [Sweeney's] brains were on the floor," R. vol. 3, 548; (3) testimony from a paramedic describing the wound as involving "a lot of hair and blood, [and] also gray matter or brains" and further stating that "there were pieces of both those things, blood clots, gray matter

authorize us "to remand a habeas corpus petition to a state court for an evidentiary hearing." *Hardcastle*, 368 F.3d at 261 (quoting *Keller*, 853 F.2d at 1129). We further agree that "even if we were able to remand directly to the state court, neither this [c]ourt nor the Supreme Court has held 'that the state courts should, after having foregone the opportunity to hold an evidentiary hearing and resolve the issue, be given another opportunity to do so.'" *Hardcastle*, 368 F.3d at 261 (quoting *Keller*, 853 F.2d at 1129); *see also Rose v. Lee*, 252 F.3d 676, 688 & n.11, 689–91 (4th Cir. 2001) (finding state court's adjudication contrary to clearly established federal law but "disagree[ing] with the district court's conclusion that a federal court lacks authority to conduct an independent review of the claim" and rejecting district court's remand of claim to state court). Indeed, in at least one case, even the Second Circuit remanded for a *Batson* reconstruction hearing in the district court without mentioning the option of remanding the case to state court. *See Jordan*, 206 F.3d at 202. Moreover, other circuits have simply remanded for *Batson* reconstruction hearings at the district court as a matter of course, without discussing whether to return the case to state court. *See, e.g.*, *Paulino I*, 371 F.3d at 1092; *Madison I*, 677 F.3d at 1339; *Harris v. Haeberlin*, 752 F.3d 1054, 1055 (6th Cir. 2014); *Holder v. Welborn*, 60 F.3d 383, 385 (7th Cir. 1995). Accordingly, we remand to the district court, not the state court.

on the floor, all consistent with a high-velocity type wound," *id.* at 589; and (4) various photographs of the crime scene, including "an area of blood" and "blood clots and some gray matter seen in [an] area on the floor," *id.* at 593; "the interior side of the wall [showing] what appears to be human tissues and hair," *id.* at 636–37; and a telephone and a power strip with red stains that appeared to be blood.

On direct appeal, Johnson argued that the trial court erred in admitting this evidence because it was more prejudicial than probative and violated his right to a fair trial under the Sixth Amendment and to due process under the Fourteenth Amendment. The OCCA did not explicitly address the constitutional aspect of this argument and rejected the claim overall in a single sentence: "[T]he trial court did not abuse its discretion when it admitted the testimony and photographs depicting the crime scene and the nature, extent[,] and location of the victim's injury." *Johnson I*, slip op. at 9. In support, the OCCA cited state cases finding no abuse of discretion in admitting crime-scene evidence in similar circumstances. *Id.*

In his habeas petition, Johnson reasserted his constitutional claim that the admission of this evidence "resulted in a fundamentally unfair" trial. R. vol. 1, 81. Specifically, Johnson pointed out both that the State refused defense counsel's offer to stipulate to the manner of death and that it was undisputed Johnson did not shoot Sweeney. Johnson therefore asserted that this "evidence was unfairly prejudicial, designed by the State to appeal to the emotions of the jury, and resulted in a fundamentally unfair adjudicatory process." *Id.*

27

The district court rejected Johnson's claim. It acknowledged that when "habeas petitioners challenge the admission of [graphic] evidence as violative of the Constitution," courts must consider "whether the admission of evidence so infected the trial with unfairness as to [violate] due process." App. 44–45 (alterations in original) (quoting *Spears v. Mullin*, 343 F.3d 1215, 1226 (10th Cir. 2003)); *see also Smallwood v. Gibson*, 191 F.3d 1257, 1275 (10th Cir. 1999) ("The essence of our inquiry . . . is whether the admission of the photographs rendered the proceedings fundamentally unfair."). And the district court found no unfairness rising to level of a due-process violation here because the evidence described and corroborated the nature of the murder and the State presented strong evidence of Johnson's guilt.

On appeal, Johnson reiterates the argument he made below. In response, the State first argues that this court should decline to consider whether the OCCA's decision was contrary to or an unreasonable application of clearly established federal law because, as a threshold matter, there is no clearly established federal law governing "the admission of allegedly gruesome testimony and photographs." Aplee. Br. 31; *see also House*, 527 F.3d at 1018. Specifically, the State contends that Johnson's citation to *Darden v. Wainwright*, 477 U.S. 168 (1986), "is unconvincing" and fails to provide clearly established federal law. Aplee. Br. 32. In *Darden*, the Supreme Court considered "whether the prosecutors' [admittedly improper] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). And the State insists that because *Darden* involved

28

prosecutorial misconduct, rather than evidentiary errors, it "is not an on-point case, and it far from establishes clearly established federal law in regard to this issue." Aplee. Br. 32.

In support, the State cites *Estelle v. McGuire*, 502 U.S. 62 (1991). There, having found the challenged evidence to be relevant, the Court stated that it "need not explore further *the apparent assumption* of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth Amendment for evidence *that is not relevant* to be received in a criminal trial." *Estelle*, 502 U.S. at 70 (emphases added). But importantly, at the outset of its discussion of this claim, the Court described its overall inquiry as "whether the admission of the evidence violated [petitioner's] federal constitutional rights." *Id.* at 68. And Johnson raised the same inquiry in his habeas petition: Did the admission of gruesome crime-scene evidence violate his constitutional right to due process?

Indeed, the Supreme Court has expressly considered whether "the introduction of . . . evidence . . . violated the Due Process Clause of the Fourteenth Amendment" by using the "analytical framework" provided by the prosecutorial-misconduct inquiry in *Donnelly* (which *Darden* followed). *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994). We have done the same, even after *House*'s holding clarifying the role of clearly established federal law under AEDPA. Specifically, in *Hooks v. Workman*, we reached the merits of the petitioner's due-process claim alleging admission of prejudicial and irrelevant evidence without questioning the existence of clearly established federal law. 689 F.3d 1148, 1180 (10th Cir. 2012); *see also id.*

29

(explaining that petitioner "is entitled to relief only if an alleged state-law error . . . 'was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process'" (quoting *Revilla v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002))). And we did so despite noting the absence of clearly established federal law supporting several of the petitioner's other claims. *See id.* at 1170 (finding no clearly established law requiring OCCA "to account for and apply" particular statistical theory to evidence of petitioner's IQ score), *id.* at 1175 (noting no clearly established federal law for claim arising from removal of juror for cause). Thus, we reject the State's argument that Johnson's claim fails for want of clearly established federal law.

Turning to the merits, Johnson argues the OCCA unreasonably concluded that the admission of the crime-scene evidence did not render the proceedings fundamentally unfair. *See Smallwood*, 191 F.3d at 1275. "[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." *Spears*, 343 F.3d at 1226 (alteration in original) (quoting *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002)). At the same time, "the fundamental-fairness inquiry requires us to look at the effect of the admission of the [evidence] within the context of the entire" trial. *Id.* Doing so requires weighing the relevance of the challenged evidence against its prejudicial value, in light of the other evidence against the petitioner. *See id.*

30

The OCCA did not explain what the evidence at issue here tended to prove or how its probative value outweighed its prejudicial impact. *See Johnson I*, slip op. at 9. The district court, for its part, concluded that "[t]he challenged evidence . . . corroborated testimony that the victim sustained a high[-]velocity gunshot wound when a shooter entered his office[] and was discovered with his head against the window." App. 45.

And indeed, to obtain the murder conviction, the State had to show (1) the unlawful death of a human, (2) caused by the defendant, (3) with malice aforethought. *See* Okla. Stat. tit. 21, § 701.7(A). That Johnson was indisputably not the shooter does not change what the State had to prove because an individual who aids and abets in the commission of a crime is "equally culpable with other princip[als]." *Conover v. State*, 933 P.2d 904, 910 (Okla. Crim. App. 1997), *abrogated on other grounds by Bosse v. Oklahoma*, 137 S. Ct. 1 (2016) (per curiam); *see also Glossip v. State*, 157 P.3d 143, 151 (Okla. Crim. App. 2007) (explaining that aiding and abetting includes "advis[ing] or encourag[ing] the commission of the crime" (quoting *Spears v. State*, 900 P.2d 431, 438 (Okla. Crim. App. 1995))); Okla. Stat. tit. 21, § 172. Thus, to prove that Johnson was guilty of murder, the State had to establish not only Johnson's involvement in the murder plot, but also the fact of the murder itself.

At least some of the evidence Johnson complains of was relevant to proving the murder, such as the testimony from the paramedic describing the victim's head wound and the crime scene. Further, at least some of the photographs were relevant

31

to corroborate the paramedic's testimony. Thus, this case is similar to *Thornburg v. Mullin*, where the petitioner challenged the admission of "six photographs depicting the charred remains of the victims' bodies" on the basis "that he had no plans to dispute the manner of death." 422 F.3d 1113, 1128 (10th Cir. 2005). We declined to grant habeas relief, noting that "[e]ven if [the defendant] did not dispute the manner of death, the [S]tate still bore the burden to convince the jury that its witnesses . . . provided an accurate account of events." *Id.* at 1129.

Additionally, this case is not like *Spears*, where we found fundamental unfairness and granted habeas relief based on the admission at sentencing in a capital trial of photographs depicting the victim with 50 to 60 stab wounds. 343 F.3d at 1227–28. There, the photographs were not probative to prove conscious physical suffering because uncontradicted evidence showed that the victim died or lost consciousness early in the beating, so "there was no logical connection between the photographs and the proposition they were offered to prove." *Thornburg*, 422 F.3d at 1129 (distinguishing *Spears*). Here, by contrast, there was a connection between the crime-scene evidence and the murder charge against Johnson.

Moreover, even if some of the challenged evidence was cumulative, that accumulation does not rise to the level of rendering Johnson's trial fundamentally unfair in violation of due process when considered in light of the strong evidence of Johnson's guilt. Where evidence against a defendant is strong, the likelihood that erroneously admitted evidence will have an unduly prejudicial impact is lessened. *Compare Wilson v. Sirmons*, 536 F.3d 1064, 1115 (10th Cir. 2008) (noting that "the

32

evidence at the guilt phase was particularly strong" before "conclud[ing] that the admission [of relevant but gruesome photographs] did not make the proceeding fundamentally unfair"), *with Spears*, 343 F.3d at 1228 (granting habeas relief based on prejudicial photographs in part because, in addition to having little to no probative value, they "were the primary aggravating evidence specifically presented at the second stage" and "constitute[d] a major part of the State's second-stage case").

Here, the district court summarized the evidence against Johnson as follows:

Aziz—who ordered the murder—testified that [Fred] accepted the job via his brother [Allen] and set a price of $10,000. According to [Allen], he met [Fred] and [Johnson] at his (Allen's) home in the days before the murder. Allen testified Fred and [Johnson] left the house to travel to Muskogee, and Aziz similarly recalled hearing that Fred was going to steal a getaway van from Muskogee. Charles Billingsley, who was not a defendant in the case, testified that he helped [Johnson] take a white Ford van from the detail shop next to Billingsley's business. On the morning of the murder, [Allen] recalled that [Johnson] came to his home. According to [Allen], [Johnson] wanted him to ask Aziz for the money so the passenger riding with [Johnson] (Terrico Bethel) could "get the murder done." That same day, Aziz recalled [Johnson] knocking on the window of his business and saying[,] "watch the news." [Johnson] never returned the white van, but Billingsley recalls seeing it on television in connection with the murder. [Allen] testified that after the murder, he collected the first $5,000 from Aziz and gave it to [Johnson]. These facts are supported by phone records showing various calls between the co[]conspirators in the time leading up to the murder.

App. 43 (citations omitted). This strong evidence of Johnson's involvement in Sweeney's murder lessens the impact of possible prejudice flowing from the admission of crime-scene evidence. *Thornburg*, 422 F.3d at 1129. Thus, "[r]eviewing the record under AEDPA's constraints," in light of the probative value of the challenged evidence and the strong evidence of Johnson's guilt, we cannot "conclude

33

that the OCCA acted contrary to or unreasonably applied federal law in concluding that [its] admission was proper." *Id.*

## III. Juror Misconduct

Next, Johnson argues that the district court erred in denying his juror-misconduct claim. Johnson first raised this claim in a motion for a new trial, which he filed after one of the jurors, Staci Petersen, contacted defense counsel and "advised that she felt forced, intimidated[,] and threatened by the acts of the other jurors into voting guilty." R. vol. 1, 407. Johnson submitted an affidavit from Petersen along with his motion for a new trial. In that affidavit, Peterson asserted that she voted guilty in part because "[j]uror Faith Williams said, 'do you really want [Johnson] to be walking on the streets? *He's got other charges* and won't be getting out of jail.'" *Id.* at 414–15 (emphasis added). Petersen further declared that the other jurors wrongly informed her a guilty vote on the conspiracy charge necessitated a guilty vote on the murder charge. She also reported that she saw one juror sleeping through the trial.

Johnson attempted to corroborate Petersen's statements with an affidavit from another juror, Tony Perez, who confirmed Petersen's intimidation allegations and said that he, too, believed that a guilty vote on the conspiracy charge necessitated a guilty vote on the murder charge. Petersen and Perez also expressed confusion regarding the need for a unanimous decision. But Perez did not mention the comment about Johnson's other charges.

In addition to her affidavit, Peterson wrote a letter to the trial court in which she reported that she was ridiculed by the other jurors, pressured into voting with the other jurors to convict, and confused about having to come to a unanimous decision. She further said that she believed the jury convicted Johnson because he was African American. This letter did not mention Williams's statement about Johnson's other charges.

Moving for a new trial, Johnson asserted that there was nothing mentioned at trial about other charges pending against him and therefore argued that "the jury panel was tainted by outside information." *Id.* at 411. The trial court denied the motion without a hearing, stating that "[j]urors cannot impeach their verdicts after they have been discharged." *Id.* at 428.

On direct appeal, Johnson argued that this juror misconduct and the trial court's refusal to conduct an evidentiary hearing deprived him of a fair trial. The OCCA rejected these claims. *Johnson I*, slip op. at 13. First, it noted that an evidentiary hearing was not required because Johnson filed his motion outside the ten-day window set forth in Oklahoma Rule of Criminal Procedure 2.1(A)(2). *Id.* And it further found no abuse of discretion in the trial court's decision not to conduct a hearing. *Id.* Second, the OCCA determined that "[t]he trial court properly refused to receive the juror's post[]verdict letter and, later, the two jurors' affidavits asserting allegations concerning the motives, methods, and mental processes by which the jury reached its verdicts because jurors are not permitted to impeach their verdicts." *Id.* at

35

14. And Johnson "otherwise[] failed to establish juror misconduct by clear and convincing evidence." *Id.*

In his habeas petition, Johnson argued that the OCCA's rulings were "an unreasonable application of *Remmer* [*v. United States*, 347 U.S. 227 (1954)]." R. vol. 1, 84. The district court disagreed, explaining that "like Oklahoma law, federal law 'prohibit[s] the admission of juror testimony to impeach a jury verdict.'" App. 46 (alteration in original) (quoting *Tanner v. United States*, 483 U.S. 107, 117 (1987)); *see also* Okla. Stat. tit. 12, § 2606(B); Fed. R. Evid. 606(b). And it noted that although there was an exception to the no-impeachment rule "where external, prejudicial information is improperly brought to the jury's attention," such exception was not available here, where the reference to other charges was vague and where Petersen did not mention the other charges in her letter to the trial court. App. 46.

On appeal, Johnson again argues that the OCCA's decision is an unreasonable application of *Remmer*. But Johnson misstates *Remmer*'s holding. Without a pinpoint citation, Johnson suggests that *Remmer* stands for the proposition "that no extraneous material is permitted in the jury room during deliberations." Aplt. Br. 43. Yet the Supreme Court made no such statement in *Remmer*, which did not involve the introduction of extraneous material in the jury room. Instead, it involved private communications with a juror: (1) someone outside of the jury suggested to a juror during trial "that he could profit by bringing in a verdict favorable to petitioner"; and (2) the trial court, the prosecutor, and the FBI investigated this potential bribe situation without informing or including the defense. 347 U.S. at 228; *see also*

36

*Tanner*, 483 U.S. at 117 (citing cases where jurors were allowed to testify about "influence by outsiders" and describing *Remmer* as case involving "bribe offered to juror"). Accordingly, we reject the argument that the OCCA unreasonably applied *Remmer* when denying Johnson's juror-misconduct claim.

Nevertheless, Johnson is generally correct that an exception to the no-impeachment rule exists, such that an evidentiary hearing—including juror testimony—is required "where extrinsic influence or relationships have tainted the deliberations." *Tanner*, 483 U.S. at 120; *see also* Fed. R. Evid. 606(b)(2)(A) (allowing juror testimony when "extraneous prejudicial information was improperly brought to the jury's attention"). But as the State persuasively argues, the OCCA did not unreasonably apply any such rule in affirming both the refusal to conduct an evidentiary hearing and the denial of Johnson's motion for a new trial.

As an initial matter, everything included in Petersen's letter to the trial court and almost everything included in the jurors' affidavits is inadmissible juror-impeachment evidence: Petersen and Perez primarily describe Petersen's mental state as a result of being intimidated by the other jurors and their misunderstandings about the relationship of the two counts and the requirement of unanimity. *See Warger v. Shauers*, 574 U.S. 40, 51 (2014) (explaining that evidence does not fall into exception for extraneous material if it is part of "the general body of experiences that jurors are understood to bring with them to the jury room"); *Tanner*, 483 U.S. at 118 (describing jurors' failure to understand instructions or mental incompetence as internal matters about which jurors may not testify); *Matthews v. Workman*, 577 F.3d

37

1175, 1181 (10th Cir. 2009) (noting Oklahoma evidentiary rule that "prohibits jurors from testifying 'as to the effect of anything upon his or another juror's mind or emotions as influencing him to assent to or dissent from the verdict'" (quoting *Matthews v. State*, 45 P.3d 907, 914 (Okla. Crim. App. 2002))). And "[t]here is nothing in clearly established Supreme Court law requiring states to take cognizance of evidence excludable under such common evidentiary rules." *Matthews v. Workman*, 577 F.3d at 1182. Further, "in light of numerous other protections designed to secure an impartial and competent jury . . . the Constitution does not require a post[]verdict hearing in which such evidence is admissible." *Id.* at 1183.

Critically, the inclusion of the reference to Johnson's "other charges" does not affect the inadmissibility of this juror-misconduct evidence. R. vol. 1, 414. Such a statement—where the trial included no evidence of Johnson having other charges—arguably falls outside the no-impeachment rule and into its exception for extrinsic influence. *See Warger*, 574 U.S. at 51 (explaining that "information is deemed 'extraneous' if it derives from a source 'external' to the jury," including "publicity and information related specifically to the case the jurors are meant to decide" (quoting *Tanner*, 483 U.S. at 117)). But we agree with the district court that this single reference to other charges "is too vague to conclude extra-record facts prejudiced the outcome at trial" or to trigger the need for an evidentiary hearing. App. 47.

We reach this conclusion because when considering whether the jury considered extraneous material, "the inquiry is not whether the jurors . . . discussed

38

any matters not of record, but whether they discussed *specific extra-record facts* relating to the defendant, and if they did, whether there was a significant possibility that the defendant was prejudiced thereby." *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005) (emphasis added) (quoting *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 n.5 (2d Cir. 1970)). And as to conducting a hearing, a court confronted with a juror-misconduct claim "'has wide discretion in deciding how to proceed' and appropriately denies a hearing when a party presents 'only thin allegations of jury misconduct.'" *United States v. Brooks*, 569 F.3d 1284, 1288 (10th Cir. 2009) (quoting *United States v. Easter*, 981 F.2d 1549, 1553 (10th Cir. 1992)). Thus, we conclude that the OCCA did not unreasonably apply any clearly established federal law when it affirmed the trial court's decisions to not conduct an evidentiary hearing and to deny Johnson's motion for a new trial.[12]

---

[12] Petersen's letter to the trial court also alleged that the jury voted to convict Johnson because he is African American. For the first time in his reply brief, Johnson argues that this allegation should have triggered an evidentiary hearing and substantive relief. *See Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017) (holding that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way" so that trial court can "consider the evidence of the juror's statement and any resulting denial of the jury[-]trial guarantee"). We decline to consider Johnson's argument because he raises it for the first time in his reply brief. *See United States v. Leffler*, 942 F.3d 1192, 1197 (10th Cir. 2019). Moreover, *Peña-Rodriguez* was not decided until well after Johnson's conviction became final; it therefore does not provide clearly established federal law applicable in Johnson's habeas proceeding. *See House*, 527 F.3d at 1015 (stating that "AEDPA 'requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state[-]court conviction became final'" (emphasis added) (quoting *Williams*, 529 U.S. at 380)).

## IV.  Cumulative Error

Last, Johnson argues that the district court erred in denying relief on his cumulative-error claim. He first raised a cumulative-error claim on direct appeal, contending that various errors accumulated to deprive him of a fair trial in violation of his due-process rights. The OCCA rejected this claim. *Johnson I*, slip op. at 18.

In his habeas petition, Johnson argued again that cumulative error rendered his trial fundamentally unfair. The district court rejected this claim because cumulative error only applies "where there are two or more actual errors," and the district court found none. App. 47 (quoting *Moore v. Reynolds*, 153 F.3d 1086, 1113 (10th Cir. 1998)).

On appeal, Johnson first argues that AEDPA deference does not apply because the OCCA did not adjudicate his cumulative-error claim on the merits. *See Harris v. Poppell*, 411 F.3d 1189, 1195 (10th Cir. 2005). In support, Johnson points out that although he asserted a cumulative-error claim related to his *trial*, the OCCA ruled only that Johnson "was not denied a fair *sentencing* trial by cumulative error." *Johnson I*, slip op. at 18 (emphasis added). The State disputes this reading, arguing that "the reference to a 'sentencing trial' was merely a typographical error" and pointing out that the OCCA cited in support cases involving claims of cumulative trial error. Aplee. Br. 51 (quoting *Johnson I*, slip op. at 18). We need not resolve this dispute because Johnson's cumulative-error claim fails even under de novo review.

In arguing that cumulative constitutional errors in his trial deprived him of his due-process right to a fair trial, Johnson seeks to accumulate all six of the substantive

errors alleged in his habeas petition. But as he acknowledges and as the State argues, Johnson cannot accumulate errors for which he does not have a COA. *See Young v. Sirmons*, 551 F.3d 942, 972–73 (10th Cir. 2008). Accordingly, our analysis of Johnson's cumulative-error claim is limited to the three substantive claims for which he has a COA. And because Johnson has not shown more than one error, he is not entitled to habeas relief on his cumulative-error claim. *See Ellis v. Raemisch*, 872 F.3d 1064, 1090 (10th Cir. 2017) ("[T]here must be more than one error to conduct cumulative-error analysis.").

## Conclusion

For the reasons explained above, we affirm the district court's denial of habeas relief on Johnson's gruesome-evidence, juror-misconduct, and cumulative-error claims. But we reverse and remand on Johnson's *Batson* claim. The OCCA relied on an unreasonable factual determination when it reviewed and approved of the prosecutor's race-neutral reasons for the challenged peremptory strikes of racial minorities when in fact, the prosecutor offered only one such reason and the trial court offered the others. It further unreasonably applied *Batson* by substituting the trial court's speculation for the prosecutor's race-neutral reasons. Reviewing Johnson's *Batson* claim de novo, we conclude that Johnson established a prima facie case of discrimination at *Batson* step one. But the trial court erred at *Batson* step two by failing to request the prosecutor's race neutral reasons and substituting its own speculation for those reasons. We therefore reverse the district court's order denying relief on that claim and remand as previously instructed for the district court to either

41

conduct a *Batson* reconstruction hearing or to determine that such a hearing would be impossible or unsatisfactory.